PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BARBARA MICHELLE BUSH,

*Defendant-Appellant.*

No. 08-6725

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Benson Everett Legg, Chief District Judge.
(8:06-cr-00202-BEL)

Argued: September 24, 2009

Decided: October 29, 2009

Before NIEMEYER and MICHAEL, Circuit Judges,
and James P. JONES, Chief United States District Judge for
the Western District of Virginia, sitting by designation.

Vacated and remanded for further proceedings by published
opinion. Judge Niemeyer wrote the opinion, in which Judge
Michael and Judge Jones joined.

## COUNSEL

**ARGUED**: Marta K. Kahn, Baltimore, Maryland, for Appellant. Bonnie S. Greenberg, OFFICE OF THE UNITED

STATES ATTORNEY, Baltimore, Maryland, for Appellee.
**ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

After Barbara Michelle Bush was indicted on two counts of threatening a federal judge, in violation of 18 U.S.C. § 876(c), a psychiatric evaluation, sought by both the government and Bush, concluded that Bush was not competent to stand trial but that there was a "substantial probability" that the administration of antipsychotic medication would restore her competence. Because Bush refused treatment, the government filed a motion for an order permitting it to medicate Bush involuntarily to render her competent to stand trial.

Applying the standard set out in *Sell v. United States*, 539 U.S. 166, 179-83 (2003), the district court granted the government's motion and ordered Bush committed for hospitalization at the Federal Medical Center in Carswell, Texas ("FMC Carswell"), where "[t]he psychiatric staff at FMC Carswell will administer antipsychotic drug treatment to Ms. Bush on an involuntary basis if she continues to refuse treatment." The court stayed its order pending Bush's appeal.

On appeal, we conclude that the government had the burden of satisfying the *Sell* standard by clear and convincing evidence and that when the current state of the record is considered with this higher standard of proof, questions arise whether the government carried its burden under *Sell*. Accordingly, we vacate the district court's April 16, 2008 order and remand for further proceedings.

I

Barbara Bush suffers from Delusional Disorder, Persecutory Type, a psychotic mental illness primarily characterized

by "nonbizarre delusions (i.e. situations that occur in real life such as being followed or persecuted)," which, according to the government's report of her condition, causes her to believe that "several federal judges, her attorney, agencies in the State of Maryland and her former employers in the federal government are conspiring to deny her money, medical treatment, educational opportunities, housing, and employment . . . [and] are attempting to discredit her by bringing criminal charges and subjecting her to psychological evaluation." She has suffered from this disease since at least 1996 and exhibited symptoms possibly as early as 1985. The disease has manifested itself in Bush by extreme litigiousness, which has led her to file, by her account, over 100 civil lawsuits since 1995. This case has its genesis in one of those suits.

While enrolled in classes at Prince George's Community College, Bush came to believe that she was improperly denied disability accommodations, was subjected to loan fraud, and was unjustly harassed regarding email communications with another student, leading her to commence a civil action in the District of Maryland, *Bush v. Kofie, et al.*, Civil Action No. PJM-05-3263 (D. Md.), which is the litigation underlying the case before us. In the course of the underlying litigation—as well as in others—Bush became convinced that the judges hearing her cases were deliberately "committing acts of abuse and assaults against her" by dismissing her claims and refusing her relief. She alleged that the stress caused by these recurring dismissals caused her to suffer several health problems.

Emanating from these perceptions, Bush wrote a letter dated December 1, 2005, to United States District Judge Deborah K. Chasanow, copying District Judge Catherine C. Blake and District Judge Colleen Kollar-Kotelly, and attached it to a pleading in *Bush v. Kofie*. While the letter's purpose to the litigation is unclear, in it she quoted a 1907 legal treatise to describe her understanding of the application of self-defense to her situation:

Barbara Michelle Bush's intentional infliction of (or, if she misses, her attempt to inflict) physical harm upon the other, or her threat to inflict such harm, is said to be justified when she acts in proper self-defense against Catherine C. Blake, Col[l]een Kotelly, and Deborah Chasanow et al., so that she is not guilty of any crime.

Thus, according to Maryland criminal law, Barbara Michelle Bush may slay any of such persons or all of them, if it reasonably appears to her to be necessary so to do to protect herself from anymore great bodily harm or death.

J.A. 152; *cf.* Francis Wharton, The Law of Homicide § 240, at 396-97 (Frank H. Bowlby ed., 3d ed. 1907).

This letter prompted the FBI to approach Bush on December 9, 2005, and warn her to stop mailing threatening communications to federal judges. It also prompted District Judge Peter J. Messitte, to whom *Bush v. Kofie* had been assigned, to warn Bush in a memorandum opinion dated December 27, 2005, not to include "threatening language" in communications with the court. Bush has remained adamant, however, that she did not intend to threaten the judges and that she did not believe her letter was threatening. In fact, in a communication to the Department of Justice, Bush claimed that the officials were accusing her of making threats as part of a "cover up," that she was simply quoting the language from a decision of the Maryland Court of Appeals, and that Judge Messitte admonished her only after he "got upset because [she] appealed his decision."

On January 6, 2006, in response to Judge Messitte's memorandum opinion, Bush sent another letter to the district court entitled "Plaintiff v. Peter J. Messitte." This letter included, in bold letters at the top, the words "NO THREAT." In the letter, Bush expressed her opinion that Judge Messitte's actions

were a threat against her and that Judge Messitte had committed "an assault" against her because he "contributed to and/or caused [her] to suffer a stroke as a direct result of Unreasonable and cruel assaults to [her] known disabilities," presumably by denying her claim for relief and warning her not to threaten federal judges. Bush again included the same language about "slaying" in self-defense that she had quoted in her December 1 letter, this time including Judge Messitte's name.

Following the second letter, Bush was arrested and charged with two counts of making threats to federal judges, in violation of 18 U.S.C. § 876(c). She was incarcerated at the Montgomery County Detention Center, where she presented "with rambling speech and as grandiose and delusional. . . . [H]er speech was described as tangential and her thought content as disordered and illogical at times." A medical examination revealed also that she had diabetes and high blood pressure, which confirmed earlier medical records. To have her evaluated, Bush was thereafter transferred to FMC Carswell in Texas.

The medical staff at FMC Carswell evaluated Bush, concluding that she suffered from Delusional Disorder, Persecutory Type, and that she was incompetent to stand trial. The report also suggested that there was a substantial probability that Bush would regain competence if treated with antipsychotic medication and that without medication it was unlikely that she would regain her competence. The report added that it was unlikely that the medication would produce serious side effects and that any side effects could be controlled.

Appended to the medical staff's report was an individual report prepared by Dr. Edulfo Gonzalez, a psychiatrist at FMC Carswell, which included his opinion that Bush would respond well to treatment with medication. Dr. Gonzalez stated that "[i]n [his] opinion, treatment with antipsychotic medication is medically indicated, and is substantially likely

to render Ms. Bush competent to stand trial." Addressing the medication specifically, Dr. Gonzalez stated that only three medications could be administered involuntarily by injection —Haldol Decanoate, Prolixin Decanoate or Enanthate, and Risperdal Consta. He explained that "the first two drugs are of the older, typical class of antipsychotic medication and potentially have more troublesome significant side effects." He therefore indicated that Risperdal Consta "would be preferable because of having fewer side effects."

Dr. Gonzalez then listed the potential side effects of antipsychotic medications, which included, among other things, "the possibility of elevated glucose and lipids, at times causing the development of diabetes mellitus in individuals who are predisposed to develop that illness." Although Bush was known to have a history of diabetes, Dr. Gonzalez did not explain why she would not be at heightened risk of developing side effects relating to this disease. Instead, he stated simply, "To the best of my knowledge Ms. Bush does not suffer from any medical conditions which would place her at substantial risk of developing any severe side effects from treatment with antipsychotic medications." Finally, Dr. Gonzalez stated, "In my experience, treating individuals with this type of problem, I have never encountered a side effect that endangered the fairness of a trial."

Because Bush refused "to cooperate with the medical staff in taking the drugs necessary to restore her to competency," the government filed a motion in the district court to order her forcibly medicated to render her competent to stand trial. The court thereafter conducted three hearings, during the first of which it directed that Bush be evaluated by her own doctor, Dr. Paul Montalbano.

Dr. Montalbano agreed with the government's diagnosis of Delusional Disorder, Persecutory Type, but disagreed that medication would be effective. He stated,

> [I]n my clinical experience, having performed over a hundred pretrial evaluations and in my capacity as Pretrial Chief, having supervised over a thousand pretrial evaluations, individuals with fixed or encapsulated paranoid delusional systems are difficult to treat even with medication and a significant number do not become competent to stand trial even if medicated. Therefore, while Ms. Bush may become competent if involuntarily medicated, I cannot agree that there is a substantial probability that she will become competent with involuntary medication.

Dr. Montalbano focused on Bush's long history of untreated mental disease and on the fact that her persecutory delusions were directed against government action to conclude that forced medication would unlikely be successful in her case.

The district court heard testimony from both Dr. Montalbano and Dr. Trent Evans, a forensic psychologist on the team at FMC Carswell that evaluated Bush. In their testimony, both experts agreed that the common wisdom in the psychiatric community is that delusional disorders rarely respond to medication. Dr. Evans testified, however, that despite this common wisdom he believed that antipsychotic medication would be substantially likely to work on Bush, relying for his opinion on Dr. Gonzalez's report, as well as a study conducted by Dr. Byron L. Herbel and Dr. Hans Stelmach ("Herbel Study"), which had been published subsequent to Bush's evaluation. *See* Byron L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, 35 J. Am. Acad. Psychiatry & L. 47 (2007).

The Herbel Study reported findings from an evaluation of the files of 22 men involuntarily medicated at the Federal Medical Center in Butner, North Carolina. Of the 22 men studied, 17, or 77%, were likely restored to competence after taking medication. More specifically, of the 16 men who, like

Bush, had Delusional Disorder, Persecutory Type, 11, or 69%, were restored to competence. But, of the 4 men with histories of untreated delusional disease longer than 13 years, only 1, or 25%, was likely restored to competence. The Study concluded:

> Despite the limitations of this study, the results provide mental health professionals some evidence that most of the incompetent male defendants with a diagnosis of delusional disorder, especially the persecution subtype, will respond favorably to involuntary treatment with standard doses of first- and second-generation antipsychotic medications. Additional research is needed to confirm and expand on these findings.

Following the hearings, the district court applied the standard in *Sell v. United States*, 539 U.S. 166 (2003), ruling as follows:

> Having carefully reviewed the evidence in this case and conducting my own investigation and questioning of Dr. Evans, I will accept the findings of Dr. Evans on both prongs [of the second *Sell* factor]. In my view, this does not detract from Dr. Montalbano's reputation, which is excellent, and his abilities, but I find that Dr. Evans is simply more experienced in this area of psychotropic medication. He was part of a multidisciplinary team that evaluated Ms. Bush over a period of a month and a half. In the aggregate, the team, all of whose members agree with Dr. Evans, is more experienced than Dr. Montalbano in this area. Also, Dr. Evans relied upon a study, and the study is certainly subject to debate, but it does point to a likelihood of restoration so that this forcible medication is not a full serum in that respect.

Accordingly, I find that the administration of psychotropic medication is substantially likely to render Ms. Bush competent to stand trial. Based upon testimony of Dr. Evans and the reports, which are admitted into evidence, I also find that the other prongs of the *Sell* test are satisfied.

Following the district court's order to medicate Bush involuntarily, Bush filed this interlocutory appeal, *see Sell*, 539 U.S. at 176-77, and the district court stayed its order pending appeal.

## II

"[A]n individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs' -– an interest that only an 'essential' or 'overriding' state interest might overcome." *Sell*, 539 U.S. at 178-79 (quoting *Riggins v. Nevada*, 504 U.S. 127, 134, 135 (1992)). This is because "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). Indeed, it has been observed that "when the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense." *Id.* at 237-38 (Stevens, J., dissenting).

At the same time, the government has a significant interest in bringing a person accused of a serious crime to trial. *See Sell*, 539 U.S. at 180. The "power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois v. Allen*, 397 U.S. 337, 347 (1970) (Brennan, J., concurring). It surely is not an overstatement to observe that the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate. Thus, when an individual com-

mits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial. Recognizing this important governmental interest, the Supreme Court has held that in some circumstances, forced medication to render a defendant competent to stand trial for a crime that the person is charged with committing may be constitutionally permissible, even though the circumstances in which it is appropriate may be rare. *See Sell*, 539 U.S. at 180. As the Court stated the principle:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Id.* at 179.

Articulating a standard for determining the circumstances in which the government may obtain a court order to medicate involuntarily a defendant to render him competent to stand trial, the Supreme Court has focused on the competing interests of the defendant and the government. The standard thus requires the government to satisfy the following four-part test: *First*, the government must show that "*important* governmental interests are at stake." *Sell*, 539 U.S. at 180. *Second*, it must show that "involuntary medication will *significantly further* those concomitant state interests." *Id.* at 181. *Third*, it must show that "involuntary medication is *necessary* to further those [governmental] interests." *Id.* And *fourth*, it must show that "administration of the drugs is *medically appropriate*." *Id.*

Because the involuntary administration of antipsychotic drugs for purposes of trial competence implicates both a person's significant liberty interest in avoiding unwanted drugs and the public's interest in prosecuting crimes, a higher standard of proof for entry of such an order is desirable. A higher standard—a standard greater than the preponderance-of-the-evidence standard but not as demanding as the beyond-a-reasonable-doubt standard—minimizes the risk of erroneous decisions in this important context. *See Addington v. Texas*, 441 U.S. 418, 425 (1979). Analogizing from the standard articulated in *Addington*, we therefore conclude that the government must satisfy the *Sell* factors by clear and convincing evidence. This is consistent with the conclusions reached by all of the other courts of appeals that have considered the matter. *See United States v. Green*, 532 F.3d 538, 545 n.6 (6th Cir. 2008); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *cf. Addington*, 441 U.S. at 423-433 (holding that due process permits involuntary commitment to a mental hospital in a civil commitment proceeding applying the clear-and-convincing standard of proof).

With these legal standards in hand, we now address Bush's arguments on appeal.

## III

Bush first contends that despite the government's concededly important interest in bringing her to trial for a "serious crime," "special circumstances" undermine that interest. *See Sell*, 539 U.S. at 180.

First, even though each count of the indictment charging her with a crime carries a maximum 10-year sentence, the Sentencing Guidelines, the government's concessions, and the district court's observations indicate that if Bush were found guilty, she would likely be sentenced to only time served. Without recognizing Bush's possible acceptance of responsibility, the Sentencing Guidelines call for a sentence of 24 to

30 months' imprisonment, and Bush has already been held 18 months in pretrial custody and more than 12 months in home confinement. Consequently, Bush argues that "continuing to press this prosecution [at] this point when under ordinary circumstances, it would have been resolved some time ago, effectively punishes Ms. Bush for being mentally ill."

Second, Bush argues that she is unlikely to be convicted in the factual circumstances of this case because the government will not be able to show the requisite intent to threaten a judge. She points out that the FMC Carswell staff concluded that she suffered from delusions at the time she sent the two letters at issue in this case and argues that this makes it likely that the letters were the product of her mental disease. In addition, she notes that her threatening letters merely quoted from an antiquated criminal treatise on the scope of self-defense. Finally, she has repeatedly announced that she never intended to threaten a judge, and her second letter states at the top, "NO THREAT."

Bush is correct in recognizing that the governmental interest in her prosecution is an important one because her conduct implicates the crime of threatening a judge, which carries a sentence of up to 10 years' imprisonment. *See United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005). Her argument rather relies entirely on *Sell*'s recognition that any important governmental interest may be "moderated" by "special circumstances." *See Sell*, 539 U.S. at 180, 186. Special circumstances include (1) the possibility that the defendant might be confined to an institution for the mentally ill, thus "diminish[-ing] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime"; (2) the potential for future confinement should the defendant regain competence; and (3) the fact that "the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Id.* at 180 (citation omitted).

Even though Bush can make a serious argument that the time she has already served in prison is sufficiently long to cover, or almost cover, any sentence that reasonably could be anticipated, this fact alone "does not defeat [the government's interest]." *Evans*, 404 F.3d at 239; *see also Sell*, 539 U.S. at 186. There are other aspects to the government's interest that make it important to bring Bush to trial for the alleged criminal conduct. *See Evans*, 404 F.3d at 239 n.9. First, the very fact that the government is prosecuting Bush for this conduct conveys a message about its seriousness and its consequences. Second, a conviction may subject Bush to a period of supervised release, *see* 18 U.S.C. § 3583, which would help ensure that she is not released into the public without appropriate monitoring. Finally, the fact of a conviction would create certain limitations on Bush's subsequent activities, such as her ability to obtain and own firearms, *see* 18 U.S.C. § 922(d)(1), (g)(1), which may be particularly important where, as here, Bush is charged with making threats against federal judges.

At bottom, we agree with the district court that even with the moderating circumstances of this case, the government has an important governmental interest in bringing Bush to trial for the charges stated in the indictment.

IV

Bush next contends that the district court erred in finding that the government satisfied its burden of proving that involuntary medication will "significantly further" the government's interest. *See Sell*, 539 U.S. at 181 (emphasis omitted). She asserts that the opinions of the government's experts, on which the district court relied, "were utterly unsubstantiated and contrary to common wisdom" and that the Herbel Study on which the government experts relied fell "vastly short of proving a substantial likelihood of restoration." In addition, Bush argues that the evidence presented by the government did not relate the likelihood of success generally in treating delusional disorders with medication to her particular condi-

tion –- a delusional disorder of the persecutory type left untreated for over 13 years.

To show that involuntary medication will "significantly further" the government's interest under the second prong of *Sell*, the government must establish by clear and convincing evidence that involuntary medication is both (1) "substantially likely to render the defendant competent to stand trial" and (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense." *Sell*, 539 U.S. at 181; *Evans*, 404 F.3d at 235.

In *Evans*, we made clear that the government must make this showing with respect to the particular defendant it seeks to medicate involuntarily. That is, "the government, considering all of the particular characteristics of the individual defendant relevant to such a determination, must . . . demonstrat[e] that the proposed treatment plan, *as applied to this particular defendant*, is 'substantially likely' to render the defendant competent to stand trial and 'substantially unlikely' to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense." *Evans*, 404 F.3d at 242 (emphasis in original) (footnote omitted); *see also United States v. Baldovinos*, 434 F.3d 233, 240 n.5 (4th Cir. 2006) ("In *Evans*, we emphasized that [the principles of *Sell*] require an exacting focus on the personal characteristics of the individual defendant and the particular drugs the Government seeks to administer.") Thus, in order to satisfy this second factor of the *Sell* test, the government must not only show that a treatment plan works on a defendant's type of mental disease *in general*, but that it is likely to work on this defendant *in particular*.

The experts in this case agreed that Bush suffers from, and has suffered from, Delusional Disorder, Persecutory Type, for at least 13 years. The medical evidence that drugs can reverse this condition is sparse and mixed. Dr. Paul Montalbano,

Bush's expert witness, testified that in over 1,300 forensic evaluations that he had conducted or supervised, he encountered 20 to 30 people with this delusional disorder, 10 or 15 of whom were medicated. Only 2 or 3 were restored to competence. He related how this finding was consistent with the experience of other psychiatrists—that "individuals with fixed delusional systems are less treatable than those with other types of psychiatric disorders in terms of ameliorating the delusion." Dr. Montalbano concluded that the evidence was insufficient to support a finding that there was a substantial probability that Bush could be rendered competent to stand trial by forcible medication.

Dr. Trent Evans, the government's expert witness, agreed with Dr. Montalbano's diagnosis of Bush. He concluded, however, that there was a substantial probability that medication would restore Bush to competency. When questioned during the hearings, Dr. Evans conceded that the literature on the efficacy of medication on delusional disorders is "sparse" and that he had personally rarely seen medication work. Of the 250 forensic evaluations in which he had been involved, about 1 or 2 percent had fixed delusional disorder, and of the 4 patients he could remember, he could think of only 1 that was restored to competence.

Dr. Evans, however, relied heavily on the Herbel Study, which reviewed the files of 22 male inmates who had been diagnosed with delusional disorder and had been involuntarily medicated. The Study found that 17 of the 22 inmates (77%) were restored to competence with antipsychotic medication. And of the 16 inmates who suffered persecutory delusions of the type suffered by Bush, 11 (69%) were restored to competence. But the Herbel Study also reveals that of the subjects who had a duration of untreated psychosis greater than 13 years, only 1 of 4 (25%) were restored to competence by medication. Dr. Evans did not explain how this Study relates to the particular circumstances of Bush, who has suffered

untreated mental illness since at least 1996 (13 years), and possibly even since 1985 (24 years).

Perhaps because our decision in *Evans* left open the government's burden of proof under *Sell*, *see Evans*, 404 F.3d at 236 n.5 (declining to reach the issue of the appropriate burden of proof), the district court in this case does not appear to have applied the clear-and-convincing standard. Because all experts agreed that there is a dearth of medical evidence about the success of medicating persons suffering from Delusional Disorder, Persecutory Type, and because Dr. Evans did not address Bush's particular circumstances, as required by *Evans*, 404 F.3d at 242; *see also Baldovinos*, 434 F.3d at 240 n.5, the application of the clear-and-convincing standard in this case might be material to the question of whether the government met its burden. For that reason, we remand this issue —the second prong of the *Sell* test—to the district court to receive further evidence, if it deems it appropriate, and to apply the clear-and-convincing burden of proof.

V

Finally, Bush contends that the district court erred in failing to address whether forced medication is medically appropriate in that it would serve her best medical interest in light of her medical condition. *See Sell*, 539 U.S. at 181. She explains, quoting *Evans*, that nowhere did the government "'set forth the particular medication and dosage' and 'relate the proposed treatment plan to the particular medical condition.'" *See Evans*, 404 F.3d at 241-42. Specifically, Bush notes that the government's report and proposal for forced medication nowhere identified the specific medication and dose range it was proposing or how the drugs' side effects would affect her diabetes.

In *Evans*, we stated, "[F]or the district court even to assess whether involuntary medication is constitutionally permissible under *Sell*'s second and fourth factors, the government

must set forth the particular medication, including the dose range, it proposes to administer to [the defendant] to restore his competency." *Evans*, 404 F.3d at 241. As we explained, "To approve of a treatment plan without knowing the proposed medication and dose range would give prison medical staff carte blanche to experiment with what might even be dangerous drugs or dangerously high dosages of otherwise safe drugs and would not give defense counsel and experts a meaningful ability to challenge the propriety of the proposed treatment." *Id.* We recognized, however, that exact precision in stating a dosage range is not necessary, so long as the government provides a reasonable range to allow medical providers the ability to adapt treatment to fit the "often vagarious bodily and psychical responses to medical treatment." *Id.*

In this case, the government's treatment plan does not provide this information. It indicates only that whatever medication is chosen will be administered by injection every two weeks. Although the government report did indicate that only three medications were in consideration—Haldol Decanoate, Prolixin Decanoate or Enanthate, and Risperdal Consta—and that Risperdal Consta "would be preferable," it indicated that the final determination would be made by the medical staff at FMC Carswell. The district court's order also did not guide or limit the medical staff's discretion.

Relegating these decisions, at least at a general level, to the medical staff contravenes our instructions in *Evans*, for without identification of the medication and dose range to be administered, the court and the defendant have little basis on which to assess the risks associated with treatment and to determine whether they are justified by the government's important interests.

The government's treatment plan also failed to provide adequate detail as to how it intended to deal with the possible side effects of the medication in view of Bush's diabetes. As we indicated in *Evans*, "While it is necessary for the govern-

ment to set forth the particular medication and dose range of its proposed treatment plan, such a description alone is not sufficient to comply with *Sell*. Rather, the government must also relate the proposed treatment plan to the individual defendant's particular medical condition." *Id.* at 241-42. To do this, the government must, among other things, "describe the plan's probable benefits and side effect risks for the defendant's particular medical condition, show how it will deal with the plan's probable side effects, and explain why, in its view, the benefits of the treatment plan outweigh the costs of its side effects." *Id.* at 242 (internal citations and footnotes omitted).

The portion of the government's medical report prepared by Dr. Edulfo Gonzalez includes as a "troublesome side effect" the "possibility of elevated glucose and lipids, at times causing the development of diabetes mellitus in individuals who are predisposed to develop that illness." Although the medical records, including the government's report, recognized that Bush has diabetes, the government's report nowhere addresses how the medication would affect Bush's diabetic condition or proposes a plan for controlling it. Again, without this information, the court and the defendant have little basis on which to assess the risks of treatment and to determine whether they are justified by the government's important interests.

Because the district court's order did not address these factors relating to the application of the fourth prong of the *Sell* test, we also remand this issue for consideration of further evidence, if it is deemed appropriate, and findings by the court.

## VI

In remanding, we in no way intend to indicate whether Bush should be involuntarily medicated. For now, we leave

that entirely up to the district court for determination in accordance with the principles set forth herein.

*VACATED AND REMANDED FOR*
*FURTHER PROCEEDINGS*