**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 12-6274**

───────────

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

  v.

MICHAEL SANDERSON,

    Defendant – Appellant.

───────────

Appeal from the United States District Court for the District of
South Carolina, at Greenville.  G. Ross Anderson, Jr., Senior
District Judge.  (6:11-cr-00331-GRA-1)

───────────

Argued:  January 30, 2013    Decided:  May 29, 2013

───────────

Before DAVIS, DIAZ, and THACKER, Circuit Judges.

───────────

Affirmed by unpublished opinion.  Judge Diaz wrote the majority
opinion, in which Judge Thacker joined.  Judge Davis wrote a
dissenting opinion.

───────────

**ARGUED:** Benjamin Thomas Stepp, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Greenville, South Carolina, for Appellant.  Jeffrey
Mikell Johnson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia,
South Carolina, for Appellee.  **ON BRIEF:** Kimberly H. Albro,
Research and Writing Specialist, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Columbia, South Carolina, for Appellant.  William N.
Nettles, United States Attorney, Robert F. Daley, Jr., Maxwell
B. Cauthen, III, Assistant United States Attorneys, OFFICE OF

THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Michael Sanderson was indicted for failing to register as a sex offender in South Carolina, in violation of 18 U.S.C. § 2250. The district court determined that Sanderson is incompetent to stand trial and ordered that he be involuntarily medicated in an attempt to restore competency. Sanderson appeals, claiming that involuntary medication, in this instance, does not comply with the requirements of the Fifth Amendment's Due Process Clause. For the reasons that follow, we affirm.

I.

In 1998, Sanderson was convicted of attempted aggravated sexual battery in Virginia state court, based on an incident involving an eleven-year-old girl. Because of his conviction, Sanderson was required to register as a sex offender. He was convicted twice in Virginia state court for failing to register.

Toward the end of 2010, Sanderson moved to South Carolina, where he again allegedly failed to register. After Sanderson missed a scheduled meeting with a probation officer in Virginia, a warrant was issued for his arrest. Thereafter, federal authorities arrested him at a motel in Greenville, South Carolina. Sanderson's motel room was littered with pornographic pictures and contained an intricate memorial to a country music star, who Sanderson claimed was his common law wife. A federal

3

grand jury indicted Sanderson for failing to register pursuant to the Sex Offender Registration and Notification Act ("SORNA"), in violation of 18 U.S.C. § 2250.

Following the indictment, Dr. Dawn Graney, a forensic psychologist at the Federal Correctional Institution, Butner ("FCI Butner"), provided the court with an initial mental health evaluation, which summarized Sanderson's lengthy history of mental health treatment. Dr. Graney offered a diagnosis of Personality Disorder Not Otherwise Specified with Antisocial Features and provisional diagnoses of Schizoaffective Disorder, Alcohol Dependence with Physiological Dependence in a Controlled Environment, and Paraphilia Not Otherwise Specified. During the evaluation, Sanderson was defensive, rejected the diagnosis of mental illness, and refused to take medication. Dr. Graney concluded that Sanderson would be unable to assist in his own defense, but that there was a substantial probability that antipsychotic medications could restore Sanderson's competency.

On July 6, 2011, a magistrate judge conducted an initial competency hearing and (1) held that Sanderson was not competent to stand trial; and (2) ordered that Sanderson remain at FCI Butner for further treatment.

Several months later, Dr. Byron Herbel and Dr. Robert Cochrane submitted a second forensic evaluation report. They diagnosed Sanderson with Schizophrenia, Paranoid Type, with

4

Interepisode Residual Symptoms; Alcohol Dependence in Early Full Remission in a Controlled Environment; Cannabis Abuse in Early Full Remission in a Controlled Environment; Paraphilia Not Otherwise Specified; and Antisocial Personality Disorder. Drs. Herbel and Cochrane noted that prior evaluations described Sanderson as being a moderate risk to reoffend; however, they offered no independent opinion concerning Sanderson's risk for recidivism as a sex offender.

Drs. Herbel and Cochrane concluded that Sanderson remained incompetent to stand trial. They also found that involuntary medication was substantially likely to return Sanderson to competency and substantially unlikely to have side effects that would interfere significantly with Sanderson's ability to assist in his own defense. Drs. Herbel and Cochrane proposed a specific treatment plan, which they concluded to be medically appropriate.

The district court held a second competency hearing, at which Dr. Herbel was the only witness. Consistent with his report, Dr. Herbel testified that there was a substantial probability that antipsychotic medications would restore Sanderson's competency to stand trial and that less intrusive measures would not be effective. Dr. Herbel also testified that there was no evidence that Sanderson posed any danger to himself or others and that Sanderson would therefore be unlikely to

5

satisfy the criteria for civil commitment. At the conclusion of the hearing, the court indicated it would order that Sanderson be involuntarily administered antipsychotic medications. On January 30, 2012, the court issued a written order.

This appeal followed. We have jurisdiction to review the district court's interlocutory order pursuant to Sell v. United States, 539 U.S. 166, 176-77 (2003) (holding that an order to involuntarily medicate a defendant is an appealable "collateral order").

## II.

### A.

Sanderson contends that the district court erred in granting the government's request that he be involuntarily administered antipsychotic medications. To assess that contention, we consider whether the record evidence presents special circumstances sufficient to overcome the government's concededly significant interest in prosecuting Sanderson's alleged SORNA violation. We review the district court's analysis of this issue de novo. United States v. White, 620 F.3d 401, 410 (4th Cir. 2010).

An individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs, which may only be overcome by an "essential" or

6

"overriding" state interest.  Sell, 539 U.S. at 178-79.  The Supreme Court has suggested that the instances in which the government may seek such a remedy to restore a defendant's competency to stand trial "may be rare," id. at 180, and we too have cautioned against making this a routine remedy, see White, 620 F.3d at 422.

When the government seeks to forcibly medicate a defendant to stand trial, the Due Process Clause requires that the government establish by clear and convincing evidence that (1) important governmental interests are at stake and not outweighed by special circumstances that diminish those governmental interests; (2) involuntary medication will significantly further those governmental interests; (3) involuntary medication is necessary to further those interests; and (4) the administration of the drugs is medically appropriate.  Sell, 539 U.S. at 180-81; United States v. Bush, 585 F.3d 806, 813-14 (4th Cir. 2009).

With respect to the first factor, the Supreme Court has provided an illustrative list of "special circumstances" that could override an important governmental interest: (1) the potential for civil confinement; (2) the potential for future confinement for a defendant who regains competence; and (3) the length of the defendant's incarceration while charges are pending.  Sell, 539 U.S. at 180.

7

In White, we concluded that the government's interest in prosecuting a defendant for conspiracy, credit card fraud, and identity theft did not outweigh her liberty interest. 620 F.3d at 422. In doing so, we relied on four special circumstances: (1) White would likely have spent a "significant amount of time" in pretrial detention in relation to her likely sentence before her trial could even begin; (2) White's alleged crimes were entirely non-violent; (3) White would likely not pose a threat to the public, because she would not be permitted to carry a firearm; and (4) the proposed antipsychotic drugs had rarely been tried on someone with White's diagnosed condition. Id. at 413-14.

With this legal framework in place, we turn to consider the parties' contentions on appeal.

B.

Sanderson argues only that the government has failed to satisfy the first Sell factor. While conceding that there is an important governmental interest in prosecuting the SORNA offense, Sanderson contends that the following special circumstances of his case override the government's interest in prosecuting him: (1) the charged offense is non-violent and victimless; (2) even if released, Sanderson will be monitored under SORNA and remain on indefinite probation in Virginia; (3) Sanderson does not pose any danger to the public or himself, as

8

evidenced by his lack of criminal behavior in the last ten to fifteen years, except for his failure-to-register offenses; (4) Sanderson will have spent a significant amount of his likely sentence in pretrial detention by the time he would be medicated and tried; and (5) the government could easily try Sanderson later if he regained competency because the evidence against him is largely documentary and not dependent upon the memory of witnesses.

The government contends that none of Sanderson's supposed special circumstances outweigh its interest in prosecuting the charged offense. According to the government, it is irrelevant that Sanderson's alleged crime is non-violent because SORNA aims to protect society from sex offenders by providing information concerning their location. In the government's view, the charged offense is deemed serious because of the threat to society as a whole. Second, the fact that Sanderson is already subject to monitoring and supervision provides little comfort to the government; Sanderson faces prosecution precisely because he has ignored those requirements. Third, the government says that Sanderson poses a threat if released because he is a sex offender who has repeatedly violated his obligation to register and has a history of violent offenses. Fourth, the government contends that the length of Sanderson's pretrial detention is not long in relation to his likely sentence, and he is likely to

be restored to competency by antipsychotic medications. Finally, the government posits that a trial may never occur unless Sanderson receives medication because Sanderson is not likely to regain competency on his own and even if he does, the government may well face challenges locating Sanderson in the future.

The district court agreed with the government. It concluded that Sanderson's failure-to-register offense, which carries a ten-year maximum sentence, is a serious offense that the government has an important interest in prosecuting. The court rejected Sanderson's argument that special circumstances override that interest. First, it concluded that Sanderson's then eleven-month period of pretrial confinement was fairly brief compared to his likely sentence. Second, it found that Sanderson's competence is likely to be restored by the prescribed treatment plan. Therefore, the court concluded that the first Sell factor was satisfied. The court also concluded that the remaining Sell factors, which are not challenged on appeal, were satisfied.

C.

We hold that the relevant special circumstances in this case are insufficient to override the government's interest in prosecuting Sanderson for the charged SORNA offense. Considering Sanderson's purported special circumstances as a

10

whole, they present a less compelling argument against forcible medication than the circumstances in White and fail to mitigate the government's interest in prosecuting him.

To begin with, the nature of the crime weighs in favor of forcible medication. While Sanderson's alleged SORNA violation is technically a non-violent crime, the government correctly notes that the purpose of failure-to-register laws is to protect society as a whole from sex offenders. This stands in contrast to the nature of the credit card fraud and identity theft crimes charged in White, which, while certainly serious, are different in both degree and kind.

Second, the monitoring requirements imposed by SORNA and Virginia's probation judgment do not help Sanderson here. Indeed, the factual record is replete with instances of Sanderson ignoring these requirements, including two convictions in Virginia for failing to register, along with his absconding from supervision in Virginia when he moved to South Carolina.

Third, the issue of whether Sanderson poses a public threat weighs in favor of forcible medication. We acknowledge that Sanderson has not been convicted of any crime, other than failing to register, since 1998. Nor does the record contain any evidence that Sanderson has been aggressive or violent during that period. Nonetheless, Sanderson has a history of violent offenses predating the offense giving rise to his

11

registration obligation, including assault with a deadly weapon, various firearms offenses, and battery. Further, Sanderson's argument that he has not been prone to violence since 1998 is undercut by the fact that he has spent a substantial amount of that time in prison. And while Dr. Herbel's opinion that Sanderson "does seem to have some kind of sexual problems" is not particularly compelling, J.A. 69, previous psychosexual reports indicated that Sanderson was at a "moderate risk" to reoffend in the community. Our concerns about Sanderson's record are buttressed by SORNA's policy that previous sex offenders should be monitored because they pose future threats. And the fact that Sanderson, while posing a potential threat, is not dangerous enough to be a candidate for civil commitment weighs in favor of forcible medication because Sanderson will go free if he is not restored to competency. See United States v. Evans, 404 F.3d 227, 239 (4th Cir. 2005).

Fourth, the length of Sanderson's pretrial detention does not greatly mitigate the government's interest. In White, the defendant had spent nearly forty-one months in prison by the time we issued the majority opinion in her case, a period of confinement that the opinion's author suggested might be close to that she was likely to receive based on her Guidelines

12

sentence. See White, 620 F.3d at 418 (Davis, J.).[1] By comparison, Sanderson had spent approximately two years in pretrial detention[2] when we heard oral argument in this case. In the district court, counsel estimated Sanderson's Guidelines sentence to be forty-one to fifty-one months' imprisonment. Assuming that this range is a reasonable estimate of Sanderson's expected prison sentence, the length of Sanderson's pretrial detention does not detract substantially from the government's interest in prosecuting him.

Apart from White, we have looked to the statutory maximum in assessing the length of pretrial detention, a test under which Sanderson fares worse. For example, we previously held that two years of pretrial detention did not constitute a significant "special circumstance" for a defendant facing a potential eight-year sentence. Evans, 404 F.3d at 239. Sanderson faces an even greater statutory maximum sentence of ten years. Thus, while Sanderson's extensive period of pretrial detention weakens the government's interest in prosecuting the

_____

[1] The Sixth Circuit recently cited favorably to this portion of White and also measured the length of a defendant's pretrial detention against the Guidelines range. See United States v. Grigsby, No. 11-3736, 2013 WL 1458009, at *9 (6th Cir. April 11, 2013).

[2] We acknowledge that Sanderson's treatment regimen may extend to 12-14 weeks before he may be fit to stand trial. Adding this period to the length of his pretrial detention does not have a material impact on our analysis.

13

offense, it does not defeat it entirely under either the measure employed in Evans or Judge Davis's opinion for the court in White.[3]

Fifth, while it is true that the government will not be substantially burdened in proving the offense if the case is delayed, the record suggests that Sanderson will not regain competence without medication. Therefore, the theoretical potential of a future prosecution does little to weigh against the government's interest in trying Sanderson now.

Finally, the likely effectiveness of the prescribed medication on Sanderson's illness supports the government's request. Although this consideration appears to mirror the second Sell factor--whether "administration of the drugs is substantially likely to render the defendant competent to stand

---

[3] Relying on his opinion in White, Judge Davis would also factor into the period of pretrial detention the additional time Sanderson will be detained "if he wishes to exhaust his appellate rights" as well as any "good time credits" to which Sanderson may be entitled. Post, at 23. It seems to us, however, that whether Sanderson will exhaust his appellate rights (and how long that will take) is entirely speculative, as is the amount of good time credit (if any) that Sanderson may earn while incarcerated. But even accepting that this additional period of confinement is relevant to the analysis and cuts against the government's interest in prosecuting the offense when compared to the estimated guidelines sentence proffered by counsel, we are satisfied that the government retains an "important interest in trying a defendant who is charged with a crime that has the potential of [a ten-year] prison term." Evans, 404 F.3d at 239.

14

trial," 539 U.S. at 181--we have previously used this as a consideration in analyzing the first factor as well. White, 620 F.3d at 420-21. Unlike White, where the prescribed medication had rarely been used to treat someone with the defendant's medical condition, see id., here medical professionals have prescribed a treatment plan with a documented history of success for individuals suffering, as Sanderson does, from paranoid schizophrenia.

## III.

In sum, the special circumstances present in this case do not outweigh the government's interest in prosecuting Sanderson. Only the length of Sanderson's pretrial detention constitutes a special circumstance in his favor. But in light of the entire record, that consideration alone is insufficient to defeat the government's interest in prosecuting Sanderson now for the charged SORNA offense. We therefore affirm the district court's order.

AFFIRMED

15

DAVIS, Circuit Judge, dissenting:

I respectfully dissent.

I

At bottom, the majority's concern appears to be that, absent our affirmance of the involuntary medication order, Sanderson will continue to live in society with an untreated mental illness, contrary to the advice of doctors. However noble that concern, Sell v. United States permits involuntary medication only for the purpose of rendering a pretrial detainee competent to stand trial, and only in those "limited circumstances" in which the government's interest in prosecution is "essential" or "overriding." 539 U.S. at 169, 178–79 (2003). The government has failed to establish such an interest here.

If nothing else, the record shows that Sanderson has not and will not register. There is no reason to believe that merely convicting him (again) will impel him to do so. Today, he is a mentally disordered, non-violent felon on lifetime probation in the Commonwealth of Virginia. After he is forcibly medicated and competently pleads guilty (as he undoubtedly will, see infra p. 24 n.6), he will become one of the more than a million mentally ill inmates across the country. See U.S. Dep't of Justice, Bureau of Justice Statistics, Doris J. James & Lauren E. Glaze, Mental Health Problems of Prison and Jail Inmates 1 (2006), available at http://bjs.gov/content/pub/pdf/mhppji.pdf ("At

16

midyear 2005 more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates."). He may then refuse his medication, increasing the likelihood that he will, upon release, remain a mentally disordered, non-violent felon on lifetime probation in the Commonwealth of Virginia, who probably will not register. The idea that forced medication of Sanderson will preclude the possibility that he will continue to live in society with an untreated mental illness, contrary to the advice of doctors, is fanciful, at best.

II

There are several more specific reasons I am compelled to dissent.

As a preliminary matter, although the majority acknowledges that the government bears the burden of proving, "by clear and convincing evidence," that "important governmental interests are . . . not outweighed by special circumstances," ante, at 7 (citing Sell, 539 U.S. at 180–81; United States v. Bush, 585 F.3d 806, 813–14 (4th Cir. 2009)), in light of the dramatically weakened governmental interests discussed herein, it appears to me to have applied a preponderance standard. See Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001)

17

("[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.") (internal quotation marks, citations, and alterations omitted). In this case, the government falls short of meeting that heavier burden, as the record fails to show it is "highly probable" that either Sanderson, the government, or the public at large will enjoy a lasting benefit by affirmance of the district court's order. See United States v. White, 620 F.3d 401, 422 (4th Cir. 2010).

Furthermore, contrary to the majority's unsupported assertion, the "nature of the crime" does not "weigh[] in favor of forcible medication." Ante, at 11. The relevant crime is failure to register, not sexual assault, cf. United States v. Myers, 598 F.3d 474, 477–78 (8th Cir. 2010) (noting that a defendant's act of sexually assaulting a child in 1996 was distinct from his act of failing to register as a sex offender in 2008), and, as the majority grudgingly concedes, failure to register is non-violent, ante, at 11. Although "the purpose of failure-to-register laws is to protect society . . . from sex offenders," the majority fails to explain how this truism counsels in favor of forced medication. Every criminal

18

proscription aims to protect society from criminals. And like the alleged credit card fraud and identity theft at issue in White, failure to register is a non-violent crime, the nature of which diminishes the government's interest in prosecution. 620 F.3d at 419. This could hardly be more self-evident than with respect to an offender already on lifetime probation.

Also, the majority overstates the significance of Sanderson's prior convictions for failure to register, concluding that "monitoring requirements imposed by SORNA and Virginia's probation judgment do not help him." Ante, at 11. In fact, the prior convictions indicate that monitoring works, insofar as the government has located Sanderson when he has failed to check in with his probation officer. The very purpose of SORNA is to track sex offenders and notify the public where they live. United States v. Under Seal, 709 F.3d 257, 265 (4th Cir. 2013). As already mentioned, to the extent that Sanderson's failure to comply with monitoring requirements endangers public safety, the government has not shown that forcibly medicating him to stand trial would more effectively protect the public. In the first place, the government has shown no connection between Sanderson's failure to register and his refusal to take antipsychotic medication. But even if such a connection exists, forcibly medicating Sanderson for competency purposes will not ensure that he continues the medication should he be convicted

19

and sentenced. Indeed, as the record shows, Sanderson has stopped taking antipsychotic medication in the past, and the government conceded at oral argument that he could not be forced to continue taking the medication after conviction and sentencing unless he posed a danger to himself or others. See Washington v. Harper, 494 U.S. 210, 227 (1990) (holding that the Due Process Clause permits the government "to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest"). The government's own witness, Dr. Bryon Herbel, indicated that the government is unlikely to make this showing because Sanderson has exhibited no recent signs of "direct aggression," "violence" or "harm" toward himself, "others[,] or property of others." J.A. 50.

Next, the majority mistakenly suggests that Sanderson "poses a public threat" that "weighs in favor of forcible medication." Ante, at 11. In reaching this conclusion, the majority cites Sanderson's "history of violent offenses," including "assault with a deadly weapon" and "battery," id., but overlooks details that diminish the apparent seriousness of these crimes. For instance, although Sanderson was convicted of assault with a deadly weapon in March 1991, he apparently was confined only a few months: seven months later, he was arrested

20

for pedestrian soliciting rides or business. Similarly, Sanderson was convicted of battery in September 1994, but received only a 10-day sentence. Id. at 106. It is curious that the majority believes it is better positioned to gauge the seriousness of these past offenses than were the sentencing judges. In any event, Dr. Herbel testified that Sanderson's recent history (the past 10 to 15 years) has been "relatively free of direct aggression or violence or overt criminal behavior aside from failure to register." J.A. 50. Thus, contrary to the majority's assertion, Sanderson does not pose a public threat absent medication.

Nor is it certain that Sanderson will simply "go free" if we do not affirm the involuntary medication order. Ante, at 12. Although the government may elect to dismiss the charges, neither the government nor the majority has explained why continued detention, for a reasonable amount of time, would violate Sanderson's due process, when forced medication would not.[1] Moreover, "[e]very state provides avenues" for civil

---

[1] To be sure, the government could not indefinitely detain Sanderson. In Jackson v. Indiana, the Supreme Court held that

> a person charged . . . with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.

(Continued)

21

commitment, Sell, 539 U.S. at 182, and the record is devoid of any facts indicating whether Sanderson would qualify for such a program.[2]

It seems clear to me, as well, that the majority underestimates the time that Sanderson will have spent in detention before trial, and how much this diminishes the government's interest in prosecuting him. The majority correctly notes that, by the day of oral argument, Sanderson had been detained about two years (24 months). Ante, at 13. His restoration to competency will take at least 12 to 14 weeks,[3]

_____

> If it is determined that this is not the case, then the [government] must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

406 U.S. 715, 738 (1972). Here, Dr. Herbel testified that "antipsychotic medication" is "the standard treatment of people who suffer from schizophrenia," and Sanderson would probably remain incompetent without the drugs. J.A. 25–26, 48. But the record also indicates that Sanderson has consented at least once before to medication, and it is unclear whether Sanderson would be more likely, after some period of continued detention (during which his counsel could continue to advise him of his best options), to consent to antipsychotic medication.

[2] Dr. Herbel testified only that Sanderson would be a "weak candidate" for commitment under federal law. J.A. 50.

[3] See Dr. Herbel Test., J.A. 35–36 (noting that effective treatment takes "eight weeks . . . at an adequate dose" of antipsychotic medication) (emphasis added), and id at 59–60 (noting that "it may take a month or six weeks" to get to a (Continued)

22

and Sanderson will be detained substantially longer if he wishes to exhaust his appellate rights. Sanderson is entitled to move for an en banc rehearing by this Court and to file a petition for certiorari to the Supreme Court, avenues that could prolong Sanderson's detention at least six additional months.[4] Furthermore, the majority fails to consider the impact of good time credits, which may significantly lengthen the amount of time Sanderson will be deemed to have served, should he ultimately be convicted and sentenced to prison. Barber v. Thomas, 130 S. Ct. 2499, 2502 (2010) ("Federal sentencing law permits . . . authorities to award prisoners credit against prison time as a reward for good behavior.") (citing 18 U.S.C. § 3624(b)).

Assuming Sanderson exhausts his appellate rights in six months (increasing his detention to 30 months), and his restoration to competency takes 12 weeks (increasing his detention to 33 months), he will be entitled to about 146 days--

therapeutic dose). Indeed, the government requested an order allowing treatment to last up to four months.

[4] Our en banc petitioning process would take a minimum of about 24 days. Fed. R. App. P. 40. Sanderson could file his petition for certiorari anytime within 90 days of the final ruling by the Fourth Circuit, and if the Government wanted to file a brief in opposition, the process would take an additional 30 days. Sup. Ct. R. 13(1), 15(3). Thus, if the Supreme Court denied his petition in less than five weeks, Sanderson's legal remedies would be entirely exhausted in about six months.

or nearly five months--of good time credits, increasing his total (credited) detention to nearly 38 months. See Barber, 130 S.Ct. at 1502–03; White, 620 F.3d at 414 n.13; 18 U.S.C. § 3624(b). This total, of course, does not include the months he will have remained in detention pending our decision in this appeal, and awaiting his trial and sentencing.[5] Adding those months to the total no doubt will bring Sanderson's credited detention within his advisory guidelines sentencing range of 41 to 51 months.[6]

I note, in addition, that the majority concedes that "the government will not be substantially burdened in proving the

---

[5] The majority asserts that "whether Sanderson will exhaust his appellate rights (and how long that will take) is entirely speculative." Ante, at p.14 n.4. But "just as counsel has vigorously pursued the appeal to this court on behalf of his mentally ill client, we would expect his vigorous representation to continue through further appellate review." White, 602 F.3d at 414 n.11.

[6] If Sanderson were to plead guilty after becoming competent (and it is impossible to believe he will not), his advisory guidelines sentencing range would be even lower: 30-37 months. See U.S. Sentencing Guidelines Manual § 2A3.5 (2013) (providing a base offense level of 16 for failure to register as a Tier III sex offender); id. at § 3E1.1 (allowing a three-level reduction in a defendant's offense level for acceptance of responsibility); id. at Sentencing Table (providing for an advisory sentencing range of 30-37 months for a defendant with an offense level of 13 and criminal history category V). See also United States v. Grigsby, No. 11-3736, 714 F.3d 964, ---, 2013 WL 1458009, at *9 (6th Cir. 2013) (taking into account this three-level, acceptance-of-responsibility reduction when considering the propriety of forcibly medicating a pretrial detainee to become competent to stand trial).

24

offense if the case is delayed." <u>Ante</u>, at 14. Although the <u>Sell</u> Court expressly identified this as a special circumstance that diminishes the government's interest in prosecution, <u>Sell</u>, 539 U.S. at 180, the majority erroneously concludes that it counsels in favor of forced medication, because "the record suggests that Sanderson will not regain competence without medication." <u>Ante</u>, at 14. The majority's focus is misplaced. Whether Sanderson will improve without medication is a separate question from whether he will likely consent to medication. That he has refused so far does not mean that he may not consent in the future. And because Sanderson's prosecution does not depend on witnesses whose "memories may fade" or on "evidence [that] may be lost," <u>Sell</u>, 539 U.S. at 180, the government has failed to show that immediate forced medication is preferable to continued detention for a reasonable period of time.[7]

---

[7] I do not dispute the majority's conclusion that "the likely effectiveness of the prescribed medication on Sanderson's illness supports the government's request" to forcibly medicate Sanderson. <u>Ante</u>, at 14. Sanderson conceded as much by not challenging the government's proof of the second <u>Sell</u> factor, whether "involuntary medication will <u>significantly further</u>" the government's interest in prosecution. <u>Sell</u>, 539 U.S. at 181 (emphasis in original). Our focus, of course, is on the first <u>Sell</u> factor, and while the efficacy of antipsychotic medication may not <u>diminish</u> the government's interest in prosecution, neither does it <u>increase</u> that interest.

In sum, the majority has failed to "ensure that this case is sufficiently exceptional to warrant the extraordinary measure of forcible medication." White, 620 F.3d at 413. Sanderson is charged with a non-violent crime; he poses no physical danger to society; forcibly medicating him to become competent for trial will not ensure his continued medication after adjudication, either during any period of further incarceration or after his certain release; the government will not be substantially burdened in proving the crime if the case is delayed; and Sanderson is unlikely to receive a sentence longer than the time he will have already served, should he be convicted. Such circumstances make clear that "little public good or benefit will be achieved" in forcibly medicating Sanderson to stand trial. White, 602 F.3d at 422.[8]

---

[8] Without in any manner questioning the bona fides of the district court's order, the plain fact that any judge wants to move cases off his docket cannot go unremarked upon. In federal and state "Baby Judge Schools," see, e.g., Steinebach v. Tucson Electric Power Co. (In re Steinebach), 303 B.R. 634, 640 (Bankr. D. Ariz. 2004), and In re Conduct of Galler, 805 N.W.2d 240, 245 (Minn. 2011), judges are routinely tutored to be mindful not to permit docket pressures to seep into decision-making. Sanderson's case presents a paradigm challenge: if he's not medicated, what is a beleaguered district judge to do? While I appreciate the challenge, we should hesitate to make forcible medication the default solution. Certainly, Sell does not countenance such an outcome. Nor is there any warrant for the Third Branch to act as the all-purpose problem-solver for systemic challenges traceable to both legislative efforts to (Continued)

We should reverse the order of the district court. Respectfully, I dissent.

over-federalize criminal law, see United States v. Bond, 681 F.3d 149, 169 (3d Cir. 2012) (Rendell, J., concurring) ("Perhaps lured by the perception of easier convictions and tougher sentences, prosecutors opt to proceed federally. There is no law against this, or principle that we can call upon, to limit or regulate it.") (internal citation omitted), cert. granted, 133 S.Ct. 978 (2013), and to the sometimes dubious exercise of prosecutorial discretion to which those efforts give rise, see generally Daniel Richman, Prosecutors and Their Agents, Agents and Their Prosecutors, 103 Colum. L. Rev. 749, 795 (2003) ("[T]he federal criminal 'code' may well be even broader than that of the states in the range of conduct it ostensibly covers."). See also Michael A. Simons, Prosecutorial Discretion and Prosecution Guidelines: A Case Study in Controlling Federalization, 75 N.Y.U. L. Rev. 893 (2000); Kathleen F. Brickey, Criminal Mischief: The Federalization of American Criminal Law, 46 Hastings L.J. 1135 (1995).