TRAXLER, Chief Judge,
dissenting:
The district court granted the government’s petition to involuntarily medicate John Watson in order to restore his competency to stand trial. The majority reverses that order, concluding that the government’s evidence was insufficient to prove that the proposed treatment plan was substantially likely to render Watson competent. In his appeal, however, Watson does not challenge the sufficiency of *430 the government’s evidence establishing the necessity of medication. Instead, he argues that the district court erred by not requiring supportive therapy in addition to medication, which Watson contends would increase the likelihood that he would be restored to competency. This court generally does not address issues not raised by the parties, and I believe it inappropriate in this case for the majority to reverse the district court on an issue raised sua sponte, particularly without giving the government notice of the change in issues or an opportunity to address it. If the issue were properly before us, however, I would find the evidence in the record sufficient to support the district court’s order.
As to the issues actually raised by Watson, I conclude that, as to one narrow issue, the district court failed to make the necessary findings. However, I believe the proper course in this circumstance is to vacate and remand for additional findings, not simply reverse the district court outright. Accordingly, I respectfully dissent.
I.
When seeking to involuntarily medicate a defendant for the purpose of restoring his competency to stand trial, the government must establish four factors by clear and convincing evidence. See Sell v. United States, 539 U.S. 166, 180-81, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003); United States v. Bush, 585 F.3d 806, 813-14 (4th Cir.2009). First, the government must prove that “important governmental interests are at stake” that are not mitigated by “[sjpecial circumstances.” Sell, 539 U.S. at 180,'123 S.Ct. 2174. Second, the government must establish that forced medication “significantly further[s]” the government’s interests because it is “substantially likely to render the defendant competent to stand trial” and “substantially unlikely” to have side effects that would undermine the fairness of a trial. Id. at 181, 123 S.Ct. 2174. Third, it must show that forced medication is “necessary to further” the government’s interests because “less intrusive means are unlikely to achieve substantially the same results.” Id. Fourth, the government must prove that the administration of the requested drug is “medically appropriate, i.e., in the patient’s best medical interest in light of his medical condition.” Id.
To carry its burden under Sell, the government must submit a proposed treatment plan specifying the particular drug and dosage it intends to administer. See United States v. Evans, 404 F.3d 227, 241 (4th Cir.2005). For the treatment plan to satisfy the requirements of the second factor, the government must show that the plan relates
to the individual defendant’s particular medical condition. In other words, the government, considering all of the particular characteristics of the individual defendant relevant to such a determination, must first show that the treatment plan will significantly further its interests. It must do so by demonstrating that the proposed treatment plan, as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial and substantially unlikely to produce side effects so significant as to interfere with the defendant’s ability to assist counsel in preparing a defense.
Id. at 242 (first emphasis added; footnote and internal quotation marks omitted).
The question posed by the first Sell factor is a legal one, and we therefore review the district court’s ultimate answer de novo and any subsidiary factual determinations for- clear error. The remaining three factors pose factual questions subject *431 to clear error review. See United States v. White, 620 F.3d 401, 410 (4th Cir.2010).
Clear error, of course, is a very deferential standard. “A court reviewing for clear error may not reverse a lower court’s finding of fact simply because it would have decided the case differently. Rather, a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.” United States v. Wooden, 693 F.3d 440, 451 (4th Cir.2012) (internal quotation marks and alteration omitted). “If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). “In cases in which a district court’s factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference.” Helton v. AT & T, Inc., 709 F.3d 343, 350 (4th Cir.2013).
II.
Given the fact-bound nature of this appeal, I will first summarize the primary evidence before the district court: the report and testimony of Dr. Robert Lucking, the government’s expert witness and staff psychiatrist at the Federal Medical Center in Butner, North Carolina, the facility where Watson is housed; a study by Byron L. Herbel and Hans Stelmach (the “Herbel Study”)[1] that was relied upon by Lucking; and the report of Dr. James Hilkey, a psychologist who served as Watson’s expert witness.
A.
Dr. Lucking submitted a report detailing his views and testified at the two Sell hearings conducted by the magistrate judge. In his report, Lucking diagnosed Watson as suffering from delusional disorder, paranoid (or persecutory) type and a “substantial thought disorder.” J.A. 357. Lucking described the nature of delusional disorder and stated his opinion that Watson was incompetent to stand trial because his “paranoid delusional beliefs” prevented Watson from “understanding] the nature and consequences of the proceedings against hipa” and prevented him from assisting his attorney. J.A. 359, 360. Lucking stated his opinion that there was a “substantial probability Mr. Watson’s competency can be restored” through treatment with an antipsychotic medication. J.A. 376.
Lucking explained that antipsychotic medications can restore the competency of those with active psychotic illnesses, and he summarized various studies supporting this general principle. As to delusional disorder more specifically, Lucking noted in his report that “[p]ast opinion of the treatment of delusional disorder with anti-psychotic medication was pessimistic. The prevailing opinion was that only a fraction of individuals with delusional disorder would respond to treatment (approximately 10%).” J.A. 371 (emphasis added). Lucking explained, however, that “more recent literature indicates a significantly better response rate,” J.A. 372, and he summarized those more recent studies, which included several with rates of suc- *432 eessful treatment (ie., fall or partial remission of symptoms)[2] exceeding 75%. Lucking acknowledged that there are “no double-blind placebo-controlled or non-blinded placebo-controlled trials in the literature related to the treatment of delusional disorder,” and that the more recent literature involved case studies, which yield “lower quality” evidence than the evidence obtained through placebo-controlled trials. J.A. 372. These shortcomings notwithstanding, Lucking believed the more recent studies “indicate delusional disorder can be treated effectively with an-tipsychotic medication.” J.A. 374.
The report explained the difference between first- and second-generation anti-psychotic drugs and noted that second-generation antipsychotics “are considered to be the first line treatment for psychotic conditions due to [their] less onerous side effect profile.” J.A. 376. The report discussed the three antipsychotic medications that could be administered involuntarily and noted that risperidone is the only second-generation antipsychotic that could practicably be administered involuntarily. Lucking stated in the report that Watson had previously been admitted to a hospital in Washington, D.C., where he was treated with risperidone. Lucking inferred from the fact that Watson was released from the hospital that he responded positively to the drug, and his treatment plan for Watson recommended the use of risperidone.
Lucking’s report stated that treatment with an antipsychotic would not produce side effects that would interfere with Watson’s ability to assist his attorney; that Watson had no underlying disease that would preclude the standard treatment of any side effects or make him susceptible to particular side effects; that risperidone would not interact with any of the other medications prescribed for Watson; and that Watson had no “underlying medical illness or conditions which would preclude or be worsened by the use of antipsychotic medication.” J.A. 375.
In the report, Lucking explained that no less-intrusive treatments were likely to achieve the same results as treatment with risperidone. While acknowledging that psychotherapy can be beneficial as an adjunct to treatment with antipsychotics, Lucking noted that there is “no evidence that psychotherapeutic techniques alone are effective alternatives for treatment with antipsychotic agents.” J.A. 375 (emphasis added). Lucking also indicated that therapy would not succeed in this case because Watson does not understand that he has a mental illness, does not believe he needs treatment, and would not participate in any form of therapy.
During the Sell hearings held before the magistrate judge, Lucking testified about the matters set out in his report and reiterated his views that Watson’s delusional disorder rendered him incompetent to stand trial and that treatment with an antipsychotic medication was substantially likely to restore Watson’s competency. Lucking also testified that he had treated “[o]n an involuntary basis” approximately ten delusional-disorder patients with anti-psychotic medication, all of them successfully.[3] J.A. 32. Lucking’s testimony also *433 elaborated on the position expressed in the report that therapy would not be helpful for Watson. Lucking explained that because thought disorders and delusions respond positively to antipsychotic medications but are not helped by therapy, he did not believe therapy would be effective to restore Watson’s competency to stand trial.
Although Lucking’s report recommended risperidone because Watson had previously been treated with it and apparently responded positively to it, Lucking testified at the hearing that he would recommend risperidone even if Watson had never taken the drug. As Lucking explained,
[t]he reason the risperidone was chosen is because we are very limited. The fact that he had received it before is a fraction of the reason for choosing that medication. That medication is chosen, one, because it’s appropriate to treat his delusional disorder; two, the side effects are more tolerable than ones from the 1st generation; the medicine is effective; and I use it a lot, and I get [a] good response [to] it. The fact that he had been on it is not the main reason I chose it for the treatment plan.
J.A. 64-65; see also J.A. 76 (“[Clinically, I believe [risperidone] is the best choice for treatment at this point in time for Mr. Watson.”).
B.
Dr. James Hilkey, Watson’s expert witness, prepared a report after interviewing Watson for nearly ten hours over the course of four separate interviews. Hilkey agreed that Watson was suffering from delusional disorder, persecutory type, and that Watson was incompetent to stand trial.
Hilkey’s report confirmed that Watson had been previously treated with risperi-done during an inpatient hospital stay. The hospital records reviewed by Hilkey noted that Watson had an adverse reaction to higher dosages of lithium but mentioned no adverse reaction to the risperidone. Watson,, however, told Hilkey that he was “terrified” of the side effects of antipsy-chotic medications and that he had “severe reactions” to the single dose of risperidone he took under court order. J.A. 381. In Hilkey’s view, Watson’s fears about the medication “interfaced with his conspiratorial belief system.” Id.
As to treatment with antipsychotics, Hilkey stated that “pharmacological treatment of Delusional Disorders [is] less efficacious than with typical psychotic disorder[s] such as Schizophrenia.” Id. Hilkey noted the “paucity of controlled, double-blind studies on treatment of individuals with delusional disorders,” id., and observed that the “existing studies” show that the persecutory type of the delusional disorder is the most resistant to treatment, J.A. 382.
Hilkey had “some question about the efficacy of pharmacological treatment with Mr. Watson,” J.A. 383, noting that “[t]he chronic nature of Mr. Watson’s illness and the fixed, well established nature of his aberrant thoughts make response to treatment (pharmacological and psychological) resistant to change,” J.A. 383. However, Hilkey never directly stated an opinion on the likely success of the treatment plan proposed by Lucking. Hilkey instead focused on the need for “[s]upportive thera *434 py,” which “has been shown to be an effective treatment.” J.A. 382. As Hilkey explained,
[t]he general goals of supportive therapy are to facilitate the treatment adherence and develop a therapeutic alliance, to provide education about the disorder, to improve social skills (i.e. not talking about delusional systems in social places) and to manage behavioral and psychological problems associated with the delusions. This is a slow process; failure to offer this type of supportive treatment in lieu of more aggressive therapy only reinforces the established fears that characterize persecutory delusional disorders.
J.A. 382-83 (footnote omitted). Given Watson’s “strongly held beliefs and reported personal experiences with psychotropic medications to include pronounced fears of death,” Hilkey believed that “any treatment approach be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated. Failure to compassionately address these fears only contributes to fears of persecution.” J.A. 383. In Hilkey’s view, Watson’s relationship with his attorneys showed his ability to form some degree of the “therapeutic alliance” required for therapy to succeed, and Hilkey “strongly believed” that supportive therapy “could increase the likelihood his competency could be sufficiently restored.” J.A. 384.
C.
■ The Herbel Study reported findings from an evaluation of the case files of twenty-two men involuntarily medicated at FMC-Butner, the same facility where Watson is housed and Dr. Lucking works. Of the twenty-two cases studied, sixteen of the patients suffered from delusional disorder, persecutory type; one had delusional disorder, grandiose type; and five were mixed persecutory and grandiose type. Overall, seventeen of the twenty-two patients (77%) were reported restored to competency. And of the sixteen patients diagnosed with delusional disorder, perse-cutory type, eleven (69%) were reported restored to competency. Of the five patients who were not restored to competency, one was mixed type and the other four were persecutory type.
The information reviewed was sufficient in nineteen cases for the authors of the Herbel Study to determine how long before treatment the symptoms had begun. The symptoms had been present for five years or less for nine patients, seven of whom were restored to competency. Six patients had had symptoms for seven to ten years, and all six of those patients were restored to competency. Of the four patients who were symptomatic for a much longer period of time (thirteen to twenty-four years), only one was restored to competency.[4]
The study reported that seven patients were restored to competency within six weeks of beginning treatment, but that the other ten who were restored to competency did not shows signs of improvement until undergoing at least three months of continuous treatment, and that some of the patients required five months of treatment before regaining competency. The authors thus recommended treatment trials of at least four months, and noted that many previous studies involved significantly shorter medication trials. In the authors’ view, the too-short duration of medication in the previous studies provided a *435 “plausible explanation” for the incorrect “conventional wisdom that these patients are refractory to treatment with antipsy-chotic medication.” J.A. 147; see also J.A. 141 (describing as “empirically unsupported” the opinion asserted in forensic psychiatric literature that “Delusional Disorder is notoriously treatment resistant”).
The authors noted that some experts have expressed concern that patients whose core delusion involves a belief that they are victims of a governmental conspiracy were not likely to respond to forced medication “ ‘precisely because the government administers the medication.’ ” J.A. 149 (quoting United States v. Evans, 404 F.3d 227, 241 (4th Cir.2005)). As to the twenty-two cases studied, sixteen had delusions of governmental persecution, eleven of whom (65%) were restored to competency; the five patients who were not restored to competency all had such delusions. In light of that data, the authors concluded that “the presence of delusions involving themes of persecution by the same government that is implementing involuntary medication does not appear to be a useful predictor of nonresponse to treatment.” J.A. 149.
The authors noted that their study was subject to the “usual limitations” inherent in “retrospective inpatient chart review,” including the “lack of standardized clinical assessments with rating scales and diagnostic instruments, as well as lack of inter-rater reliability studies.” Id. Because of those limitations,
some patients may have been misdiagnosed and wrongly included or excluded from this study population. Standard research methods to reduce bias, such as random assortment to assigned treatment groups, the use of a placebo control group, and blinded outcome measures, were not possible in this study. Without these safeguards, the opinions , of the forensic examiners may have been biased in favor of finding a positive response to treatment.
J.A. 149-50. The authors, however, also pointed out a strength of the study:
[T]he patient cohort was selected in a real-world manner by criminal prosecution, after which they were assessed and involuntarily treated in a real-world manner at a forensic mental health facility. The main contribution of this study was the observation of treatment response in patients with delusional disorder who, in contrast to the usual protocols in community research studies, were not permitted to drop out of treatment. That 10 of the 17 patients who responded to treatment required continuous antipsychotic treatment for at least three months, and some up to five months, was unexpected. This result provides a plausible explanation for the presumed refractory nature of delusional disorder symptoms. The real obstacle to a positive treatment response in delusional disorder may not be the intrinsic biological features of the illness, but may instead be the difficulties in convincing these patients to adhere to an adequate trial of medication.
J.A. 150 (emphasis added).
III.
When considering whether the government’s proposed treatment plan was “substantially likely to render the defendant competent to stand trial,” Sell, 539 U.S. at 181, 123 S.Ct. 2174, the district court concluded that Dr. Hilkey strongly recommended supportive therapy but that he never opined that medication alone would not restore Watson’s competency. On appeal, Watson contends that the district court’s analysis reflects a clearly erroneous understanding of Hilkey’s testimony. See Brief of Appellant at 2 (“[T]he district *436 court clearly err[ed] by misunderstanding the opinion of the defense expert about the necessity of holistic treatment.”); id. at 25 (“The district court’s misunderstanding of Dr. Hilkey’s conclusions constitutes clear error.”). Acknowledging that Hilkey never directly stated that the proposed treatment plan would not work, Watson contends that when Hilkey’s report is considered in its entirety, its meaning is clear: “Dr. Hilkey does not disagree with Dr. Lucking that Mr. Watson should be medicated. To the contrary, Dr. Hilkey agrees that medication is-necessary, but it must be combined with supportive therapy in order to be successful.” Brief of Appellant at 24. Watson thus argues the district court clearly erred by misinterpreting Hilkey’s report and by not requiring the government to provide supportive therapy as part of the treatment plan.
Rather than focusing on the need for supportive therapy, however, the majority reverses the district court’s order after concluding that the government’s evidence was insufficiently related-to Watson himself and his particular medical condition, and that the government’s “generalized” evidence was insufficient to carry its burden of proof under Sell. See Majority Op. at 419 (“[T]he government has not met its burden of proving that involuntary medication is substantially likely to restore Watson’s competency....”); id. at 425 (“Permitting the government to meet its burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment.”).
A challenge to the overall sufficiency of the evidence, however, is very different from a challenge to the sufficiency of the district court’s distillation of the evidence. A challenge to the sufficiency of the evidence asks whether there is any plausible view of the evidence that supports the district court’s decision. See Anderson, 470 U.S. at 573-74, 105 S.Ct. 1504; United States v. Springer, 715 F.3d 535, 545 (4th Cir.2013); see also VICI Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 283 (3d Cir.2014) (“A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.” (internal quotation marks omitted)). A challenge to sufficiency of the district court’s distillation of the evidence, however, asks whether the district court as fact-finder properly “synthesize[d] the evidence in a manner that accounts for conflicting evidence or the gaps in a party’s evidentia-ry presentation.” Doe v. Menefee, 391 F.3d 147, 164 (2d Cir.2004) (Sotomayor, Circuit Judge); accord Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir. 1983) (explaining that clear error may be found where “the findings under review ... were made without properly taking into account substantial evidence to the contrary”). An insufficient distillation of the evidence is an error that can be corrected by the district court, through an order on remand that considers all evidence and properly accounts for contrary evidence. Insufficient evidence, by contrast, cannot be corrected by the district court — insufficient evidence is insufficient, regardless of the thoroughness of the order evaluating it.
In this case, Watson simply does not challenge the sufficiency of the government’s evidence. Watson does not argue on appeal that the government’s evidence, standing alone, was insufficient to satisfy the Sell requirements, nor does he contend that the government’s evidence was not sufficiently individualized to him and his condition. Instead, by arguing that the district court failed to grasp the import of Hilkey’s report, Watson is challenging only the district court’s synthesis of the evi *437 dence, not the existence of the evidence. Indeed, Watson’s argument that Hilkey’s report establishes the need for medication and supportive therapy effectively concedes that the record contains evidence sufficient to establish that Watson’s competency can be restored.
Thus, without acknowledging what it is doing, the majority disregards the argument actually made by Watson and resolves the appeal on an entirely different basis involving an entirely different kind of error — the government’s failure to carry its burden of proof, rather than the district court’s failure to properly synthesize the evidence.[5] Moreover, by reversing the district court’s order without remanding, the majority is granting relief that no one has sought, as Watson does not seek a reversal, but instead asks this court to vacate and remand for further proceedings.[6]
It is well-settled that this court may affirm a district court’s order on any basis appearing in the record. See, e.g., Blum v. Bacon, 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) (“[A]n appellee may rely upon any matter appearing in the record in support of the judgment below.”); Scott v. United States, 328 F.3d 132, 137 (4th Cir.2003) (“We are, of course, entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court.”). When it comes to reversing a district court’s order, however, our discretion is much more constrained. As a general rule, this court does not consider non-jurisdictional issues that are not properly presented in an appellant’s opening brief, see, e.g., Suarez-Valenzuela v. Holder, 714 F.3d 241, 248-49 (4th Cir.2013), much less issues that the appellant never even attempts to raise. While we have the power to address issues not raised by the appellant, see A Helping Hand, LLC v. Baltimore Cnty., 515 F.3d 356, 369 (4th Cir. 2008), we do not exercise that power in civil cases unless the issue “establishes fundamental error or a denial of fundamental justice,” In re Under Seal, 749 F.3d 276, 285-86 (4th Cir.2014) (internal quotation marks omitted).[7]
The majority does not contend that the error it identifies rises to the level of a fundamental error, nor does it otherwise attempt to explain why the facts of this case justify such a departure from our settled practice. This court should not be *438 in the business of re-writing the parties’ briefs and raising issues we think they should have raised. Watson does not challenge the sufficiency of the evidence on appeal, and I believe it is improper in this case for the majority to reverse the district court on an issue the majority has raised sua sponte, particularly where the government has been given no notice of the change in the direction of this appeal nor an opportunity to address the issue the majority finds dispositive.
IV.
As discussed above, I do not believe the sufficiency-of-the-evidence question is properly before us. But if it were, I would disagree with the majority’s analysis. In my view, the evidence before the district court was sufficient to support the court’s factual determination that involuntary medication was “substantially likely to render the defendant competent to stand trial.” Sell, 539 U.S. at 181, 123 S.Ct. 2174.
A.
In finding the government’s evidence insufficient, the majority focuses on our requirement that the government “show that a treatment plan works on a defendant’s type of mental disease in general, [and] that it is likely to work on this defendant in particular” Bush, 585 F.3d at 816. To show the appropriate consideration of the defendant “as an individual,” Evans, 404 F.3d at 240, the evidence must establish that the experts recommending involuntary medication “actually considered [the defendant’s] particular mental and physical condition in reaching [their] conclusions,” id. In my view, Lucking’s report, fairly read, is replete with evidence of his consideration of Watson himself and his particular medical condition.
According to the majority, the entirety of Lucking’s analysis justifying the proposed treatment plan was that “(1) anti-psychotic medication effectively treats psychotic symptoms; (2) Watson has psychotic symptoms; (3) therefore, antipsy-chotic medication will effectively treat his psychotic symptoms,” an analysis the majority rejects as “nonspecific, syllogistic reasoning.” Majority Op. at 425. I disagree.
While Lucking did note in his report that “there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with antipsychotic medication,” J.A. 369, that was not the entirety of his analysis when recommending medication. Lucking’s report discussed delusional disorder in general, but also described how the disorder presented itself in Watson and the nature of Watson’s delusions. Lucking considered the general efficacy of antipsychotic medications on psychotic illnesses generally, but he then went on to consider the efficacy of antipsychotic medications on Watson’s specific condition by discussing the limited scientific literature addressing the treatment of delusional disorder, acknowledging studies to the contrary, but noting that the more recent literature shows a high rate of improvement in response to medication. Indeed, as Lucking’s report indicates, the Herbel Study shows a high treatment response rate by patients with the persecutory subtype (69% restored to competency) and high response rates by patients whose delusions had persisted for approximately as long as Watson’s.[8] *439 Lucking therefore supported his proposed treatment plan with scientific literature involving similarly situated patients suffering from Watson’s specific disorder, as we require. See Bush, 585 F.3d at 816 (concluding that Herbel Study did not “re-laten to the particular circumstances” of the defendant with 13-year history of untreated persecutory type of delusional disorder, because Herbel Study showed 25% recovery rate for defendants with “duration of untreated psychosis greater than 13 years”); White, 620 F.3d at 421 (finding Herbel Study to be of “limited assistance” in case involving female defendant suffering from grandiose type of delusional disorder because Herbel Study involved male defendants, only one of whom had the grandiose form of the disorder).
In addition, Lucking considered whether Watson was taking medication that would adversely interact with his proposed treatment or had other medical conditions that would place him at special risk for developing the more serious side effects or preclude the standard treatment for managing any side effects. Lucking also considered Watson’s beliefs about himself and his illness when concluding that therapy would not be beneficial. Cfi Bush, 585 F.3d at 818 (finding proposed treatment plan inadequate where it recommended medication that can cause diabetes without acknowledging that defendant had diabetes, addressing how the medications woúld affect his diabetes, or outlining a plan for controlling his condition).
And after considering all the circumstances, Lucking determined, in his expert opinion, that treating Watson with risperi-done was substantially likely to restore his competence. As Lucking explained, it was the delusional beliefs that were rendering Watson incompetent, and risperidone
produces beneficial clinical effects such as decreasing delusional beliefs.... By decreasing delusional beliefs this decreases the influence they have on decisions, judgments, and perceptions. This will allow Mr. Watson to make reasonable, rational, reality based decisions regarding the processing of his legal charges. By decreasing delusional beliefs and restoring more normal thought processes, risperidone can improve the level of communication between the client and his attorney.
J.A. 369. Given the amount of detailed information contained in Lucking’s report and testimony, I fail to understand how the majority can reject Lucking’s analysis as “nonspecific, syllogistic reasoning.”
The majority contends that its rejection of Lucking’s evidence is warranted because his report and testimony failed to
relate[ ] the proposed treatment plan to Watson’s particular medical condition .... There is virtually nothing in Lucking’s report or testimony ... that is sufficiently specific to Watson that it could satisfy the government’s burden of showing that Watson is substantially likely to be rendered competent by forcible medication, let alone meet the rigorous clear and convincing standard.
Majority Op. at 425 (emphasis added). While the majority finds the government’s evidence insufficiently specific, it provides no concrete example of how the evidence is inadequate or what other information should have been presented. The closest the majority comes to actually identifying the perceived deficiencies is its suggestion that the evidence failed to connect the proposed treatment plan “not only [to Watson’s] medical condition but also [to] his age and the nature and duration of his delusions.” Majority Op. at 424.
*440 As recounted above, however, the evidence in the record does precisely that. The government’s evidence addresses the efficacy of involuntary treatment of those with the persecutory form of delusional disorder, which is Watson’s “medical condition.” The government’s evidence, particularly the Herbel Study, shows success in treating the persecutory subtype of delusional disorder and thus addresses the “nature” of Watson’s delusions. The Her-bel Study likewise shows success in involuntarily treated defendants whose delusions have persisted approximately as long as Watson’s, thus addressing the “duration” of Watson’s illness.[9]
While the majority contends that the district court did not explicitly address questions raised by Dr. Hilkey about whether Watson’s “particular persecutory delusions” would respond to medication, Majority Op. at 428, a failure by the district court to address a given issue cannot be equated to a failure of proof. The evidence presented by the government provided bases for the district court to conclude, despite the questions raised by Hilkey, that the government’s proposed treatment plan was substantially likely to restore Watson’s competency. Given the wealth of information showing the government’s consideration of Watson’s specific diagnosed ■ psychological condition as well as his physical condition, the majority’s rejection of the government’s evidence simply cannot be squared with our highly deferential standard of review.
B.
The majority draws support for its conclusion on Lucking’s testimony at the Sell hearing that he would have recommended risperidone for Watson whether or not Watson had previously taken it. In the majority’s view, this testimony shows that Lucking’s recommendation “rested not on any individualized assessment of Watson, but on the belief that ‘antipsychotics are the treatment of choice for psychotic symptoms’ — the same nonspecific, syllogistic reasoning we have previously rejected.” Majority Op. at 427.
Lucking’s risperidone recommendation was based on Lucking’s belief that Watson had previously taken it without incident and, as discussed above, on an individualized assessment of the particular disorder affecting Watson, the other medications Watson was taking, and whether Watson had any underlying conditions that would cause or complicate the treatment of any side effects. Moreover, Lucking reached his recommendation by relying on studies involving treatment of patients suffering from Watson’s specific disorder. Lucking’s recommendation was therefore based on a consideration of Watson’s particular diagnosis and physical condition. That Lucking also had more generalized reasons to chose risperidone[10] does not somehow negate the individualized aspects of Lucking’s analysis and render it insufficient as a matter of law.
*441 C.
The majority also suggests that the government’s evidence is insufficient because the academic literature relied upon by Lucking does not “bear[ ] on Watson’s particular medical condition or circumstances,” Majority Op. at 425, and because of “weaknesses” the majority perceives in the studies that support Lucking’s conclusions, id. at 426. Again, I disagree.
1.
As noted by the majority, not all of the studies cited in Lucking’s report specifically address the treatment of delusional disorder, and not all of those specifically addressing delusional disorder show a positive response to treatment by a majority of the patients. Nonetheless, Lucking’s report discusses several studies, including the Herbel Study, that provide clear support for the use of antipsychotic drugs in the treatment of delusional disorder generally and more specifically in the treatment of the persecutory form of the disorder.[11]
While the studies that discuss the general efficacy of antipsychotics in the treatment of psychotic illnesses may not bear on Watson’s particular medical condition, I am perplexed by the majority’s claim that the other including the Herbel Study, which studied the efficacy in the prison context of involuntary medication to restore the competency of defendants suffering from delusional disorder. The scientific literature thus directly addresses Watson’s specific condition and was properly relied on by Lucking and .the district court. Indeed, if these studies do not bear on Watson’s particular medical condition, it seems unlikely that any academic literature short of a paper devoted entirely to the treatment of the actual defendant in question would meet the majority’s unexplained standard for “bearing” on an incompetent defendant’s particular medical condition.
2.
More troubling than the majority’s claim that the academic literature does not bear on Watson’s particular condition, however, is the majority’s failure to give any weight to the supportive studies when determining the sufficiency of the evidence before the district court. The majority concedes that the Herbel Study provides unequivocal support for the government’s proposed treatment plan, but it dismisses that study as “vulnerable to bias in favor of finding a positive response to treatment.” Majority Op. at 426 (alteration and internal quota-' tion marks omitted). The majority does not mention the other supportive studies, *442 presumably because of the unidentified “weaknesses” perceived by the majority.
The majority’s treatment of these studies, particularly its rejection of the Herbel Study, fails to respect the limited role of an appellate court applying clear-error review. The question in this case is not whether the majority itself is persuaded by Dr. Lucking and the studies he relied on, but whether there is any plausible view of the record that clearly and convincingly establishes the propriety of the proposed treatment plan. See Anderson, 470 U.S. at 573-74, 105 S.Ct. 1504. And when answering that question, we are required to view the evidence in the light most favorable to the government, the prevailing party. See United States v. Antone, 742 F.3d 151, 155 n. 1 (4th Cir.2014) (reviewing district court’s order finding defendant subject to indefinite civil commitment as a sexually violent predator).
As noted above, Lucking’s report discussed studies that concluded that delusional disorder, including the persecutory subtype, can be successfully treated with antipsychotic medications, and he also discussed studies reaching the opposite conclusion. The district court was thus presented with conflicting evidence about the efficacy of treating delusional disorder with antipsychotic medications, a conflict that the court implicitly, but nonetheless undeniably, resolved in the government’s favor. And under our standard of review, this court is obliged to defer to the district court’s resolution of the conflict. See Anderson, 470 U.S. at 574, 105 S.Ct. 1504 (explaining that deference to district court’s factual findings is required “even when the district court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts”).
Rather than treating the positive studies as evidence supporting the proposed treatment plan, however, the majority treats the conflict in the evidence as an opportunity for factfinding. The majority weighs the conflicting scientific literature and declares it “equivocal,” and then rejects the equivocal evidence as insufficient to support Lucking’s opinion. This approach is inconsistent with our role as a reviewing court, “for our function is not to reweigh the evidence presented to the district court.” United States v. Charleston County, 365 F.3d 341, 349 (4th Cir.2004); see Ceraso v. Motiva Enters., LLC, 326 F.3d 303, 316 (2d Cir.2003) (“The weight of the evidence is not a ground for reversal on appeal, and the fact that there may have been evidence to support an inference contrary to that drawn by the trial court does not mean that the findings are clearly erroneous.” (citation omitted)).
Moreover, the majority’s specific criticism of the Herbel Study — that it is vulnerable to bias — provides no basis for removing the Study from the sufficiency-of-the-evidence equation. As noted above, the authors of the Herbel Study acknowledged that “[sjtandard research methods to reduce bias, such as random assortment to assigned treatment groups, the use of a placebo control group, and blinded outcome measures, were not possible” given that the study consisted of a “retrospective inpatient chart review.” J.A. 149-50. These criticisms, however, could be le-velled against all of the studies, positive or negative, addressing the treatment of delusional disorder. As the record makes clear, delusional disorder is very rare, and there are no controlled studies of the use of antipsychotic medication to treat delusional disorder, only case studies, which yield “lower quality” evidence than do controlled studies.
Notwithstanding the limitations inherent in the limited available' scientific literature, both Dr. Lucking and Dr. Hilkey relied on *443 the available literature when reaching their conclusions. There is no evidence in the record raising any question about the propriety of that reliance, nor is there any other evidence that otherwise would permit us to reject the Herbel Study or the other studies supporting Lucking’s position and exclude them from consideration when evaluating the sufficiency of the evidence.
The majority suggests that the supportive studies would be entitled to some evi-dentiary weight if there had been some “explanation or analysis applying their findings to Watson as an individual.” Majority Op. at 426. However, all of the information necessary to apply to the findings of these studies to Watson is found in Lucking’s report, which makes it clear that the studies involved the use of antipsychotic medications to treat those suffering from delusional disorder, including the persecutory subtype of the disorder. Lucking’s report does not use impenetrable scientific jargon when describing the studies, and the district court was thus more than capable of reading Lucking’s report and drawing its own conclusions about the various studies discussed in the report. See, e.g., United States v. Bales, 813 F.2d 1289,1293 (4th Cir.1987) (explaining that where the district court acts as factfinder, “the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts ... [and] may select among conflicting inferences to be drawn from the testimony”). While it perhaps would have been helpful if Lucking had explicitly testified that the studies addressed the very condition affecting Watson, his failure to do so cannot be grounds for reversal when that information was otherwise presented to the district court.
When the scientific evidence is considered along with Lucking’s report and testimony and viewed in the light most favorable to the government, see Antone, 742 F.3d at 155 n. 1, I believe that evidence is sufficient to support the district court’s order.
D.
To the extent the majority’s real complaint is that the government’s evidence is not compelling enough to constitute clear and convincing evidence as a matter of law, then I again disagree.
Evidence crosses the clear and convincing threshold if it is “of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.” Springer, 715 F.3d at 538 (internal quotation marks omitted).
In my view, a factfinder could reasonably find the Herbel Study more compelling and its conclusions more persuasive than the earlier studies questioning the efficacy of medication for delusional disorder. As previously noted, ten of the seventeen Herbel-Study patients restored to competency took three months or longer to respond to the medication, a period significantly longer than the medication trials involved in the earlier, more pessimistic studies. See J.A. 150 (“That 10 of the 17 patients who responded to treatment required continuous antipsychotic treatment for at least three months, and some up to five months, was unexpected. This result provides a plausible explanation for the presumed refractory nature of delusional disorder symptoms.”). Moreover, unlike earlier studies of voluntary treatment for delusional disorder, the Herbel Study demonstrates the efficacy of medication when the subjects are not permitted to drop out of treatment. Because the Her-bel Study assessed the success of involuntary treatment administered under circum *444 stances largely identical to those at issue in this case and provides a reasonable basis for discounting the more pessimistic conclusions of other studies, I believe a factfinder could reasonably find that the Herbel Study clearly and convincingly supports the government’s position. Cf United States v. Gillenwater, 749 F.3d 1094, 1103 (9th Cir.) (O’Connor, J.) (finding district court did not clearly err in accepting testimony of Dr. Lucking over defense expert who “relied exclusively on older studies,” when Lucking “relied on more recent studies indicating that the older negative view was mistaken”), cert. denied, — U.S. -, 135 S.Ct. 222, 190 L.Ed.2d 169 (2014).
Similarly, there is evidence in the record making it reasonable for the factfinder to assign significant weight to Lucking’s recommendation. As noted above, Lucking testified that he had involuntarily medicated approximately ten defendants suffering from delusional disorder, all of whom were restored to competency. His personal success in treating the same disorder as Watson’s, under the same circumstances that Watson would be treated, could reasonably be viewed by the factfinder as strong evidence that the treatment plan proposed by the government was substantially likely to restore Watson’s competency.
The majority, however, dismisses the evidence of Lucking’s experience because Lucking provided no details about those patients and we therefore do not know how many of his patients suffered from the persecutory type of disorder or what type of medication was used. While more detail would be helpful, I do not believe the lack of detail somehow renders Lucking’s experience irrelevant, particularly since the Herbel Study shows a high response rate for all delusional-disorder patients, including those with the persecutory subtype, and finds that the presence of delusions of governmental persecution “does not appear to be a useful predictor of nonres-ponse to treatment.” J.A. 149. Because the factfinder would be entitled to consider Lucking’s testimony in light of the other evidence presented at trial, see, e.g., Davis v. Richmond, Fredericksburg & Potomac R.R. Co., 803 F.2d 1322, 1327 (4th Cir. 1986), the findings of the Herbel Study make the lack of detail in Lucking’s testimony less significant than the majority suggests. Under these circumstances, I believe it is improper for the majority to refuse to consider Lucking’s testimony about his experience treating defendants with delusional disorder as part of its evaluation of the sufficiency of the evidence.
In my view, then, the record thus provides a plausible basis for the factfinder to slide extra weight over to the government’s side of the scale and conclude that the evidence clearly and convincingly establishes the propriety of the proposed treatment plan. Although there is evidence supporting a contrary conclusion and raising questions about certain aspects of the government’s proposed plan, that contrary evidence does not raise such substantial questions about the government’s evidence as to render it insufficient as a matter of law, but instead simply creates questions of fact for resolution by the fact-finder. See, e.g., United States v. Heyer, 740 F.3d 284, 292 (4th Cir.2014) (“[Evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer.” (internal quotation marks omitted)). I therefore disagree with the majority’s conclusion that the government’s evidence was insufficient to carry its burden of proof.
V.
I now turn to the merits of Watson’s argument that the district court clearly *445 erred by misinterpreting Hilkey’s report and the need for supportive therapy in addition to medication.
A.
In its order, the district court acknowledged that while Hilkey “strongly supported] the use of supportive ... psychotherapy alongside pharmacological treatments, Hilkey “did not opine in his forensic evaluation that Dr. Lucking’s treatment plan will be unsuccessful.” J.A. 340. Citing Lucking’s report and testimony, the district court held that the proposed treatment plan was substantially likely to render Watson competent to stand trial, and the court granted the government’s motion to involuntarily medicate Watson without requiring the government to provide supportive therapy-
On appeal, Watson argues that the district court erred by finding that Hilkey only suggested supportive therapy in addition to medication. Watson contends that Hilkey’s report made it clear that medication must be combined with supportive therapy for the medication to succeed in restoring his competency. Watson argues that because the district court misunderstood Hilkey’s report, the ' district court never gave proper consideration to the evidence contradicting Lucking’s evidence and thus clearly erred.[12] See, e.g., Wooden, 693 F.3d at 454 (finding clear error where district court ignored substantial amount of contradictory evidence). In support of his argument, Watson points to Hilkey’s statement that “any treatment approach be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated.” J.A. 383 (emphasis added). According to Watson, this statement “unequivocal[ly]” shows Hilkey’s view that “[a]ny treatment must be offered in a supportive manner. Otherwise, forcible medication just reinforces fears of persecution.” Brief of Appellant at 24.
In my view, Hilkey’s report is much less conclusive on this point than Watson contends. Regarding supportive therapy, Hil-key stated that “[s]upportive therapy has been shown to be an effective treatment” for delusional disorder, J.A. 382, and that “[t]he literature on treatment of persons with delusional [disorder] strongly encourages the use of supportive and cognitive behavioral psychotherapy for the treatment of Delusional Disorder,” J.A. 384. Noting that ‘Watson has the capacity to form a degree of therapeutic alliance should someone attempt to do so,” Hilkey stated his “strongly held opinion” that such supportive therapy “could increase the likelihood his competency could be sufficiently restored.” Id. (emphasis added).
While it is apparent that Hilkey thought supportive therapy was very important, the district court correctly observed that Hilkey never directly stated that the proposed treatment plan of medication with *446 out therapy would not work. Indeed, Hil-key’s statement that supportive therapy could increase the likelihood of success suggests that medication alone has at least some likelihood of success. And the statement that Watson emphasizes — that “any treatment approach be it pharmacological or psychological must be offered in a supportive manner,” J.A. 383 (emphasis added) — seems to implicitly acknowledge that there are supportive and non-supportive ways to administer either approach to treatment, medication or therapy. Under this reading, Hilkey’s recommendation that medication be administered in a supportive manner does not amount to a statement that supportive therapy is required. Given the lack of clarity in Hil-key’s report, I cannot find clear error in the district court’s conclusion that Hilkey did not opine that medication alone would not be effective to restore Watson’s competency. See Anderson, 470 U.S. at 573-74, 105 S.Ct. 1504 (factual findings are not clearly erroneous “[i]f the district court’s account of the evidence is plausible in light of the record viewed in its entirety”); id. at 579, 105 S.Ct. 1504 (deferring to trial court’s interpretation of ambiguous testimony).
Although I do not believe that the district court’s interpretation of Hilkey’s report is clearly erroneous, I nonetheless agree with Watson that the district court’s findings are inadequate to show that it properly considered the entire range of evidence relating to supportive therapy. While Hilkey’s report is ambiguous as to whether supportive therapy is required, the report unambiguously establishes that supportive therapy is beneficial as an adjunct to medication in that it can, inter alia, encourage compliance with the treatment plan and help mitigate the per-secutory fears that might otherwise be exacerbated by the government forcibly administering the medication. Dr. Lucking made the same point in his report, noting that “there is evidence” that psychotherapy is “beneficial to an individual with psychotic symptoms ... as an adjunctive treatment to the antipsychotic agents to improve such things as insight, compliance, or coping skills.” J.A. 375.
The district court thus had before it evidence from both the government and the defense establishing that supportive therapy is a beneficial addition to a medication-based treatment plan for patients suffering from delusional disorder, with no evidence raising any doubts about that conclusion. The court also had before it Dr. Hilkey’s undisputed[13] opinion that including therapy in the treatment plan would increase the likelihood that the plan would succeed in restoring Watson’s competency to stand trial. The district court noted Hilkey’s strong preference for using therapy along with medication, but it did not acknowledge the additional benefits obtained when supportive therapy is added to a medication plan or the medication-suceess-enhancing nature of supportive therapy. And while the district court noted Lucking’s view that therapy alone would not help Watson, the court did not explain why it determined that therapy should not be required in addition to medication.[14]
*447 In my view, the evidence of the benefits of adjunctive supportive therapy is, at the very least, relevant to the factual question of whether the government’s medication-without-therapy plan was not merely likely, but “substantially likely,” Sell, 539 U.S. at 181, 123 S.Ct. 2174 (emphasis added), to restore Watson’s competency. Given the sensitive nature of “an involuntary medication order, which trenches upon the elemental individual liberty interest in refusing the invasive administration of mind-altering medication,” United States v. Chatmon, 718 F.3d 369, 376 (4th Cir.2013), it is important for the district court to fully consider treatment options that maximize the likelihood the treatment will succeed. And in this case, where there is disagreement over the medication-success-rates in the limited available scientific literature, but agreement among the expert witnesses that adjunctive therapy can increase treatment compliance, it seems especially important for the district court to give explicit consideration to the value of adjunctive therapy. Cf Herbel Study, J.A. 150 (“The real obstacle to positive treatment response in delusional disorder may not be the intrinsic biological features of the illness, but may instead be the difficulties in convincing these patients to adhere to an adequate trial of medication.”).
While I do not suggest that the district court was required to order adjunctive supportive therapy, the court was at least required to acknowledge the evidence establishing its benefits. See Chatmon, 718 F.3d at 376 (“Of course, a district court need not credit a defendant’s evidence or accept his arguments, but its findings should offer some reason why it did not.”); Wooden, 693 F.3d at 454 (“Although the district court might not have been required to accept that the evidence recounted above proved Wooden’s ongoing pedophilia, the court was required to at least consider the evidence, and account for it, when concluding otherwise.”). The district court’s failure to consider relevant evidence when determining that the government’s plan was substantially likely to succeed means that the court’s factual finding cannot be sustained. See United States v. Francis, 686 F.3d 265, 273 (4th Cir.2012) (“A court commits clear error when it makes findings without properly taking into account substantial evidence to the contrary.” (internal quotation marks omitted)); Jiminez v. Mary Washington Coll., 57 F.3d 369, 379 (4th Cir.1995) (explaining that district court clearly errs when it “disregard^] substantial evidence that would militate a conclusion contrary to that reached”).
B.
I turn now to the question of remedy. The majority, finding the government’s evidence insufficient, reverses the district court’s order without remanding for additional proceedings. As I have explained, however, the sufficiency of the government’s evidence is not properly before this court. Instead, the only issue properly before this court is whether the district court’s factual findings are sufficient to support the court’s substantially-likely-to-succeed conclusion.
When an appeal turns on an error by the district court, the proper remedy would normally be to vacate the district court’s order and remand for further proceedings, so as to give the district court the opportunity to reconsider the issue; only in unusual cases would this court render judgment for a party after identifying an error by the district court. See Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (noting that when a district court fails to make required factual findings, “a *448 remand is the proper course unless the record permits only one resolution of the factual issue”); aaiPharma Inc. v. Thompson, 296 F.3d 227, 235 (4th Cir.2002) (noting, after finding error by district court, that “[ojrdinarily, the proper course would be to vacate the district court’s judgment and to remand,” but concluding that “special circumstances allow us to put aside the district court’s procedural error and render a decision on the merits” (emphasis added)); see generally Chatmon, 718 F.3d at 376 (“Because the district court erred in its analysis of the third Sell factor, we vacate the involuntary medication order and remand for further findings.”); Wooden, 693 F.3d at 463 (vacating and remanding for reconsideration after identifying numerous deficiencies in district court’s factual findings).
In this ease, the record is not so one-sided that it renders the district court’s error harmless, nor is there any other reason to bypass the usual remand route.[15] Accordingly, because I believe that the only error in this case is the district court’s failure to address the issue of ad-junctive supportive therapy, I would vacate the district court’s order and remand for further proceedings to permit the district court reconsider the issue and make the findings necessary to support its ultimate conclusion.
VI.
For the reasons set out above, I believe that the sufficiency of the government’s evidence is not properly before this court and that it is improper for the majority to reverse the district court on an issue the majority has raised sua sponte. The majority’s reversal is particularly inappropriate since the government has had no opportunity to brief the issue or defend the sufficiency of its evidence before this court. Indeed, counsel for the government will surely be surprised by the outright reversal in this case, given that the only relief sought by the appellant was the vacating and remanding for reconsideration of the district court’s order. Nonetheless, even if the sufficiency of the evidence were properly before us, I believe that the evidence is more than sufficient to survive appellate review. And as to the issues actually raised by Watson,[16] I would vacate the district court’s order and remand for reconsideration and additional findings by the district court on the necessity of ad-junctive therapy.
*449 Accordingly, I hereby respectfully dissent from the majority’s decision to reverse the district court’s order granting the government’s petition to involuntarily medicate Watson.

. See Byron L. Herbel & Hans Stelmach, Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder, 35 J. Am. Acad. Psychiatry & L. 47 (2007). The Herbel Study was submitted to the district court as part of Watson's opposition to the government’s petition.

. Lucking explained that "it is generally psychotic symptoms which render an individual incompetent,” and that "the fewer psychotic symptoms present, and the less intense the symptoms, the more likely that individual is to be competent. Therefore, even a partial response to antipsychotic medication can re-suit in a restoration of competency.” J.A. 370.

. The majority questions whether Lucking's testimony establishes that the ten patients were treated involuntarily. In my view, it clearly does. See J.A. 32 (“Q. How many patients suffering from delusional disorder *433 have you treated with antipsychotic medication? A. On an involuntary basis, it’s not a lot of them because many of them — it's a rather rare disorder that you don't see very often. So probably somewhere around ten patients over the course of my career here I've treated with antipsychotics.” (emphasis added)).

. The evidence in the record establishes that Watson had been suffering from delusions since 2008 or 2009. Thus, when the district court issued its order in April 2014, Watson had been suffering from the disorder for five to six years.

.While the majority does note some deficiencies in the district court’s order and briefly mentions the cumulative effect of the errors it identifies, the opinion nonetheless makes it clear that the majority is reversing for insufficient evidence. See Majority Op. at 419 ("In this case, we conclude, the government has not met its burden of proving that involuntary medication is substantially likely to restore Watson’s competency.”); id. at 429 ("We therefore hold that the district court clearly erred in finding that the government has met its burden of proving, by clear and convincing evidence, ... that the proposed treatment plan, as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial.” (internal quotation marks omitted)).

. Although Watson’s opening and reply briefs ask us to vacate without mentioning remand, counsel made clear at oral argument that Watson is asking us to vacate the district court’s order and remand for further proceedings.

. Of course, “[wjhen an issue or claim is properly before the court,” a reviewing court "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.” Ka-men v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (emphasis added). This rule has no application in this case because Watson does not challenge the sufficiency of the evidence, and the sufficiency issue thus is not properly before this court.

. As noted, Watson had been delusional for five or six years prior to the district court's ruling. Nine patients in the Herbel Study had been symptomatic for five years or less, seven of whom (77%) were restored to competency. Six patients been symptomatic for *439 seven to ten years before treatment, all of whom (100%) were restored to competency.

. As to age, the record shows that the government properly recorded and reported Watson's age in the relevant forms and reports. Beyond the possible connection of age to the duration of symptoms, however, there is nothing in the record suggesting that a patient’s age is relevant to issues in this case. That is, nothing in the record suggests, for example, that older patients are more prone to suffer from the side effects of antipsychotics, or that patients of a particular age are more or less responsive to antipsychotic drugs.

. As Lucking’s report and testimony established, second-generation antipsychotics are preferred over first-generation antipsychotics because of their less-severe side-effect profile, and risperidone is the only second-generation medication that cam practicably be administered involuntarily.

. As the majority concedes, the Herbel Study "unequivocally support[s] the involuntary use of antipsychotic medication to restore the competency of defendants with the Persecutory Type of Delusional Disorder.” Majority Op. at 426. In addition to the Her-bel Study, Lucking’s report discusses a 1995 article reviewing 209 cases of delusional disorder being treated with antipsychotics, which determined that 53% of the patients fully recovered, 28% partially recovered, and 20% did not improve. While there is no indication of how many of the patients suffered from the persecutory form of the disorder, the study revealed that "[tjreatment was positive regardless of delusional content,” J.A. 372 (emphasis added), thus indicating that the persecutoiy form of the disorder is no less responsive to medication. And since the record establishes that "even a partial response to antipsychotic medication can result in a restoration of competency,” J.A. 370, the study’s 81% full-or-partial recovery rate clearly supports Lucking’s opinion that delusional disorder can be successfully treated with anti-psychotics. Lucking’s report also discusses a 2006 study involving eleven patients with de•lusional disorder, ten of whom had a complete remission of symptoms after being treated with a first-generation antipsychotic.

. The majority touches on this issue in the course of identifying various deficiencies in the district court’s order. According to the majority, the district court "summarily disregarded Hilkey’s report in its entirety, solely because Hilkey failed to state expressly that the proposed treatment plan would not succeed.” Majority Op. at 427-28. The majority contends that the district court thus failed to address Hilkey’s questions about Lucking’s reading of the scientific literature, Hilkey’s view that “the fixed, well established nature” of Watson’s delusions made them "resistant to change,” J.A. 383, or Hilkey’s belief that supportive therapy was required to maximize the likelihood that medication would be effective. As previously noted, however, insufficiency of the government's evidence, not inadequacy of the district court's findings, is the basis for the majority’s reversal of the district court's order.

. Lucking did not affirmatively state that therapy increases the likelihood that medication will be successful, but nothing in his report or testimony contradicts or raises questions about Hilkey’s view.

. Lucking testified that therapy alone would be ineffective because delusions respond to medication, but not therapy, and because Watson did not agree that he was mentally ill and would not participate in therapy. While using therapy as an adjunct to medication would seem to eliminate at least a portion of these concerns, Lucking did not address *447 whether adjunctive therapy would be appropriate in this case.

. In the majority’s view, "remand is inappropriate because the record permits only one resolution of the factual issue: that this burden cannot be met.” Majority Op. at 429 (internal quotation marks omitted). For the reasons previously discussed, I strongly disagree with the majority’s assessment of the record. Even if the evidence were insufficient, however, this court in such circumstances has previously remanded rather than reversed. See Bush, 585 F.3d at 817-18 (finding government's proof deficient in several respects and ”remand[ing] this issue for consideration of further evidence, if it is .deemed appropriate, and findings by the court”); Evans, 404 F.3d at 242-43 (finding government's evidence insufficient to carry Sell burden and "remand[ing] with instructions for the district court to reassess the motion after affording the parties the opportunity to supplement the record in a manner consistent with this opinion”).

. Watson also challenges the district court’s analysis of the first Sell factor, which requires the government to show that important interests are at stake that are not mitigated by special circumstances. See Sell v. United States, 539 U.S. 166, 180, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Watson contends that he would likely succeed in establishing an insanity defense, which would subject him to civil commitment, see 18 U.S.C. § 4243(a), and that the district court therefore erred by not treating that defense as a special circumstance that mitigated the government’s interest in prosecution. As the district court noted, however, an insanity defense and the competency-to-stand-trial inquiry focus on different questions, and there is nothing in the record *449 establishing or even suggesting that the delusions prevented Watson from recognizing the wrongfulness of his actions. See United States v. Mackey, 717 F.3d 569, 574 (8th Cir.2013) ("That Mackey was delusional at the time of his arrest does not necessarily mean that he could mount a successful insanity defense.”). I see no error in the district court's conclusion that the record established only the possibility that Watson would assert and un-mately succeed on an insanity defense, and that the mere possibility of establishing the defense did not substantially undermine the government’s strong interest in prosecuting Watson. Cf. United States v. Evans, 404 F.3d .227, 239-40 (4th Cir.2005) (explaining that the “unlikely future civil confinement” of the defendant does not "make unimportant the Government’s interest in prosecuting [the defendant] on the serious charges against him”).